BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
KYLE W. KAHAN (Cal. Bar No. 298848)
Assistant United States Attorney
Deputy Chief, General Crimes Section
KELLYE NG (Cal. Bar No. 313051)
Assistant United States Attorney
Major Crimes Section
JASON A. GORN (Cal. Bar No. 296179)
Assistant United States Attorney
Transnational Organized Crime Section
     1200/1300/1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2238/8408/7962
     Facsimile: (213) 894-3713
     E-mail:    kyle.kahan@usdoj.gov
                kellye.ng@usdoj.gov
                jason.gorn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 2:18-00172(A)-GW-1,6,7,8 |
| Plaintiff, | GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENTS OF ACQUITTAL AND MOTIONS FOR NEW TRIAL (DKTS. 1799; 1800; 1802; 1803; 1804; 1805; 1807; 1808; 1809); EXHIBITS; DECLARATION OF KYLE W. KAHAN |
| v. | |
| MICHAEL LERMA, _et al._, | |
| [#1 MICHAEL LERMA] [#6 CARLOS GONZALEZ] [#7 JUAN SANCHEZ] [#8 JOSE VALENCIA GONZALEZ] | |
| | Hearing Date: January 5, 2026 Hearing Time: 8:00 a.m. Location:    Courtroom of the Hon. George H. Wu |
| Defendants. | |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Kyle W. Kahan, Kellye Ng, and Jason A. Gorn, hereby files its omnibus

opposition to defendants' motions for a judgment of acquittal and for a new trial.

This opposition is based upon the attached memorandum of points and authorities, exhibits, declaration, and the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 3, 2025          Respectfully submitted,

                                 BILAL A. ESSAYLI
                                 First Assistant United States
                                 Attorney

                                 ALEXANDER B. SCHWAB
                                 Assistant United States Attorney
                                 Acting Chief, Criminal Division


                                 _____/s/_____
                                 KYLE W. KAHAN
                                 KELLYE NG
                                 JASON A. GORN
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.    INTRODUCTION.......................................................1

II.   STATEMENT OF FACTS.................................................2

      A.    "You Are Not Going to Make it Through This Time":
            Mexican Mafia Brother Mike Lerma Threatens Steve
            Bencom for Failing to Pay a Drug Debt and He and His
            Criminal Associates Make Good on That Threat..............2

      B.    "Go Ahead and Let Your Cellie Rest, He's a Little Bit
            Tired": Surveillance Video and Witnesses Place
            Defendants Alone with Bencom and Instruct CW-6 to Stay
            with His Body Overnight...................................3

      C.    With Bencom Dead, Defendant Sanchez Bragged to Inmates
            that they "Handle Business" and Defendant Carlos
            Gonzalez Yelled "Don't Pray for Me, Pray for the Other
            Guy."....................................................7

      D.    "Die Already, Why Aren't You Dying": Defendant Sanchez
            Admits to the Murder and Offers Graphic Details Only
            Otherwise Experienced by Bencom and Known by the
            Medical Examiner.........................................8

      E.    Jury Verdict.............................................9

III.  Rule 29...........................................................10

      A.    Legal Standard...........................................10

      B.    Defendant Lerma's Rule 29 Motion (Dkt. 1804).............12

      C.    The Evidence in the Light Most Favorable to the
            Government Supports the Denial of Defendant Jose
            Valencia Gonzalez's Joint Rule 29 and Rule 33 Motions
            (Dkt. 1799)..............................................15

      D.    Sufficient Evidence Supports Carlos Gonzalez's
            Convictions on Counts One, Seven, and Eight (Dkt.
            1800)....................................................19

            1.    The Evidence Showed that Defendants Acted with
                  Premeditation, Deliberateness, and Willfulness
                  and that Defendant Carlos Gonzalez Knew or
                  Contemplated that the Conspiracy Would Engage in
                  Murder.............................................20

            2.    Defendants Murdered or Aided and Abetted the
                  Murder of Bencom...................................21

            3.    Defendants Try to Conceal the Murder...............23

            4.    Defendant Lerma Made the Rules and Defendants

## <u>TABLE OF CONTENTS (CONTINUED)</u>

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

        Carlos Gonzalez, Jose Valencia Gonzalez, and Juan
        Sanchez Were the Enforcers..........................24

IV.  Rule 33.................................................26

     A.    Legal Standard........................................26

     B.    Defendant Lerma's, Carlos Gonzalez's, Jose Valencia
           Gonzalez's, and Juan Sanchez's Rule 33 Motions (Dkt.
           1803, 1804, 1805, 1807, 1808, 1809)....................28

           1.    Defendants' New Evidence Lacks Credibility..........28

           2.    Defendants' New Evidence is Neither Newly
                Discovered nor Diligently Obtained..................29

           3.    The "Newly Discovered" Evidence is Immaterial
                Impeachment Evidence and Would Not Result in an
                Acquittal...........................................30

           4.    The Court's Rulings and Defendant Lerma's
                Inability to Secure Witnesses does not Warrant a
                New Trial...........................................33

     C.    Defendant Sanchez's Joint Rule 33 Motion (Dkt. 1802).....35

V.   CONCLUSION..............................................41

**TABLE OF AUTHORITIES**

**CASES**

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993).........................................37

Jackson v. Virginia,
    443 U.S. 307 (1979)..............................10, 11, 12

Kumho Tire Co., Ltd. v. Carmichael,
    526 U.S. 137 (1999).........................................38

McDaniel v. Brown,
    558 U.S. 120 (2010).........................................11

United States v. A. Lanoy Alston, D.M.D., P.C.,
    974 F.2d 1206 (9th Cir. 1992)..........................28, 33

United States v. Alarcon-Simi,
    300 F.3d 1172 (9th Cir. 2002).........................17

United States v. Archer,
    977 F.3d 181 (2d Cir. 2020)..........................27

United States v. Begay,
    673 F.3d 1038 (9th Cir. 2011)..........................11

United States v. Corona-Verbera,
    509 F.3d 1105 (9th Cir. 2007).........................18

United States v. Cristophe,
    833 F.2d 1296 (9th Cir. 1987).........................37

United States v. Davis,
    960 F.2d 820 (9th Cir. 1992)..........................31

United States v. Diggs,
    649 F.2d 731 (9th Cir. 1981)..........................29

United States v. Gordon,
    246 F. Supp. 522 (D.D.C. 1965)..........................30

United States v. Harrington,
    410 F.3d 598 (9th Cir. 2005)..........................30

United States v. Johnson,
    337 F.3d 180 (4th Cir. 1964)..........................28, 33

United States v. Kulcyzk,
    931 F.2d 542 (9th Cir. 1991)..........................28

United States v. LaVictor,
    848 F.3d 428 (6th Cir. 2017)..........................27

1

**TABLE OF AUTHORITIES (CONTINUED)**

2

DESCRIPTION                                                      PAGE

3
United States v. Lewis,
    787 F.2d 1318 (9th Cir. 1986)................................11
4

United States v. Martinez,
5    763 F.2d 1297 (11th Cir. 1985)..............................27

6
United States v. Nevils,
    598 F.3d 1158 (9th Cir. 2010)....................10, 11, 12, 17
7

United States v. Panza,
8    612 F.2d 432 (9th Cir. 1979)................................29

9
United States v. Pelisamen,
    641 F.3d 399 (9th Cir. 2011)................................11
10

United States v. Pimentel,
11    654 F.2d 538 (9th Cir. 1981)................................27

12
United States v. Ramirez-Rodriguez,
    552 F.2d 883 (9th Cir. 1977)................................18
13

United States v. Reed,
14    575 F.3d 900 (9th Cir. 2009)................................10

15
United States v. Reed,
    875 F.2d 107 (7th Cir. 1989)................................28
16

United States v. Rocha,
17    598 F.3d 1144 (9th Cir. 2010)...............................10

18
United States v. Sanchez,
    2018 WL 6171824 (D. Mont. Nov. 26, 2018)....................33
19

United States v. Sanchez,
20    969 F.2d 1409 (2d Cir. 1992)................................27

21
United States v. Solorio,
    669 F.3d 943 (9th Cir. 2012)................................11
22

United States v. Valverde-Rumbo,
23    2017 WL 3895789 (N.D. Cal. Sept. 6, 2017)...................30

24
United States v. Wheeler,
    753 F.3d 200 (D.C. Cir. 2014)...............................27
25

**OTHER AUTHORITIES**
26

Ninth Circuit Model Jury Instr. No. 1.5..........................16
27

28

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

**RULES**

Fed. R. Crim. P. 29....................................................1, 10, 27

Fed. R. Crim. P. 33....................................................2, 26, 27

Fed. R. Evid. 402.............................................................35

Fed. R. Evid. 403.............................................................35

Fed. R. Evid. 702.............................................................37

Fed. R. Evid. 803.............................................................35

Fed. R. Evid. 804.............................................................34

Fed. R. Evid. 807.............................................................34

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

Defendant Michael Lerma, a member of the Mexican Mafia,

4 controlled criminal activity within several state and federal

5 custodial facilities and the City of Pomona using the criminal

6 enterprise he created to exercise that power. His co-defendants,

7 Carlos Gonzalez, Juan Sanchez, and Jose Valencia Gonzalez, served as

8 soldiers and enforcers within that enterprise. This power culminated

9 with the murder of Steve Bencom in the Metropolitan Detention Center

10 ("MDC") on June 28, 2020 and ended with defendants' RICO, VICAR

11 murder, first-degree murder, drug trafficking, and felon-in-

12 possession of firearms convictions following a five-week jury trial.

13

Each defendant now individually and jointly moves for a judgment

14 of acquittal pursuant to Federal Rule of Criminal Procedure ("Rule")

15 29 and for a new trial pursuant to Rule 33. Defendants unpersuasively

16 argue the absence of certain physical evidence warrants an acquittal

17 (Valencia Gonzalez Br., Dkt. 1799); or relitigate within a vacuum

18 that the BOP rules could outperform the surveillance evidence,

19 defendants' damning admissions, and the inevitable truth that Lerma's

20 rules controlled Bencom's true time of death (Sanchez Br.; Dkt 1801);

21 or instead resume and relitigate a cross-examination of CW-6[1] with

22 old theories, obscure internet clippings, and newly manufactured

23 inmate affidavits (Carlos Gonzalez Br., Dkt. 1800; Lerma Br., Dkt

24 1804.)

25

26

27

28

---

[1] The government uses the abbreviation "CW" to describe its six cooperating witnesses.  The government will file a legend identifying the corresponding witness to the CW-# label under seal.

All of this is to say that defendants' hall of mirrors only comes into focus when the trial is looked at in the entirety of the government's case -- through the surveillance video that showed the lock-step organization and execution leading up to Bencom's murder and its corroboration of CW-6's testimony, the remarkable admissions to the scheme and the murder from defendants, testimony from fellow inmates who saw defendant Sanchez push Bencom into the cell followed by the Gonzalez brothers in the last moments of his life, and how Jose Valencia Gonzalez washed his hands of the murder but not the crime. The defendants' motions fail to demonstrate that no reasonable juror could have convicted them of the counts of conviction.

Likewise, defendants' motions for a new trial pursuant to Rule 33 either largely reiterate the Rule 29 claims and are wrong, or involve dubious new witness affidavits and evidence that should not be considered newly discovered evidence on a material matter. These motions should be denied. The evidence at trial overwhelmingly supported guilty verdicts on all counts. Moreover, there is nothing exceptional about this Court's pretrial or mid-trial rulings that warrant a new trial.

## II.  STATEMENT OF FACTS

   **A.  "You Are Not Going to Make it Through This Time": Mexican Mafia Brother Mike Lerma Threatens Steve Bencom for Failing to Pay a Drug Debt and He and His Criminal Associates Make Good on That Threat.**

In 2020, pretrial defendants Michael Lerma, Jose Valencia Gonzalez, Carlos Gonzalez, and Juan Sanchez were housed in 6 North ("6N") at MDC in neighboring cells 625 and 627. (Dkt. 1714, 16:6-10; 17:1-3.) Victim Steve Bencom and his friend and cellmate, CW-6, were down the hall on the same floor in Cell 619. (Dkt. 1714, 15:19-21.)

1  Soon after they arrived, defendant Lerma began to control the drug

2  trade in 6N and all four defendants imposed discipline on inmates who

3  owed money or failed to follow the rules defendant Lerma imposed.

4  (Dkt. 1714, 193:4-12; 195:12-14, 198:9-15; Dkt. 1716, 164:21-165:23.)

5  Ultimately, Bencom's drug debts to defendants Lerma and Jose Valencia

6  Gonzalez put a target on him; defendant Jose Valencia Gonzalez would

7  openly tell other inmates that "if he doesn't pay his ass, he's going

8  to stab him." (Dkt. 1714, 181:18.) A week before Bencom's death,

9  another inmate attempted to pay Bencom's debt, but defendant Jose

10  Valencia Gonzalez would not allow it. (Dkt. 1715, 111:5-11, 112:20-

11  25.) Three or four days before Bencom's murder, defendant Lerma along

12  with two or three other people came to Bencom's cell and said to him

13  "You need to take care of this. You are not going to make it through

14  this time. There is nothing I can do for you."[2] (Dkt. 1715, 115:25-

15  116:1-16.)

16      **B.**    **"Go Ahead and Let Your Cellie Rest, He's a Little Bit Tired": Surveillance Video and Witnesses Place Defendants**

17             **Alone with Bencom and Instruct CW-6 to Stay with His Body Overnight.**

18

19  On June 28, 2020, the last day Bencom was seen alive, defendant

20  Juan Sanchez instructed CW-6 to tell Bencom "come by [Sanchez's cell]

21  so [Sanchez] could give him that sugar" to make pruno, jailhouse

22  wine. (Dkt. 1717, 206:10-15.) As instructed by defendant Sanchez, CW-

23

24          [2] CW-1, Lerma's former right-hand man, testified that it is a

25  problem owing a debt to the Mexican Mafia because "they want their money," and from his own experience owing money to defendant Lerma,

26  he thought he was going to get killed. (Dkt. 1711, 213:1-3, 7-10, 18-21.) CW-1 further testified that "people get killed for 2- or $300."

27  (Id. at 213:23.) Another Sureño and MDC inmate, CW-2, testified that he saw defendant Valencia Gonzalez's ledger and saw at least two of

28  Bencom's balances, including one for $1,200 and another for $2,400. (Dkt. 1715, 60:10-61:9.)

6 told Bencom, his friend and cellmate, to stop by defendant Sanchez's cell. (Dkt. 1717, 206:16-20.) Video surveillance corroborated CW-6's testimony that defendant Sanchez walked down the hallway with Bencom. (Dkt. 1717, 206:16-20; 207:9-21; 233:14-22; 234:11-21; see also Dkt. 1714, 39:14-19.) But then CW-6 saw defendant Juan Sanchez push Bencom into cell 619. (Dkt. 1717, 207:20-23.)

CW-6 was not in his cell when defendants Jose Valencia Gonzalez, Carlos Gonzalez, and Sanchez were alone with and outnumbered Bencom. (Dkt. 1717, 206:18-207:8, 209:11-25.) Partially obstructed surveillance video showed defendants Carlos Gonzalez, Jose Valencia Gonzalez, and Lerma then walk toward the direction of Bencom's cell. (Dkt. 1717, 235:19-236:10; see also Dkt. 1717, 209:11-17 (CW-6 testifying he saw defendants Carlos Gonzalez and Jose Valencia Gonzalez come out of their cell and followed defendant Sanchez and Bencom into Bencom's cell).)

MDC 6N inmate CW-3 was on the phone in the common area of 6N when he saw Bencom enter his cell, followed inside by defendants Jose Valencia Gonzalez, Carlos Gonzalez, and Sanchez. (Dkt. 1715, 123:14-125:5.) After ending his phone call, CW-3 tried to walk back to his cell next to Bencom's but was turned away by another inmate. (Dkt. 1715, 125:13-126:1.) From the common area, CW-3 saw another inmate approach Bencom's cell and get redirected, which was corroborated by surveillance. (Dkt. 1715, 128:7-11.) CW-3 estimated that defendants Jose Valencia Gonzalez, Carlos Gonzalez, and Sanchez were alone with Bencom in his cell for between 10-15 minutes until they left. (Dkt. 1715, 128:16-22, 129:25-130:14.) When CW-3 headed back to his cell, he caught a passing look of Bencom laying on the bottom bunk in his cell, which was not his usual bed. (Dkt. 1715, 90:19-25, 132:20-

4

1   133:19.) He also caught a glimpse of defendant Jose Valencia Gonzalez
2   as he washed something in the sink of his own cell. (Id.)

3       Fellow MDC 6N inmate CW-4 testified that he saw the three
4   defendants leave Bencom's cell, and Lerma separately attempted to
5   enter Bencom's cell until he looked at CW-4 and walked away. (Dkt.
6   1716, 175:5-9, 178:5-9.)

7       Bencom was never seen alive on camera again. Up until the end of
8   the 15-minute common area release, surveillance video also confirmed
9   CW-6 was not in his cell and had visited the upper tier of the
10  housing unit until he eventually returned to his cell at the end of
11  his 15-minute release. (Dkt. 1717, 237:21-25; 239:219-25.)

12      As CW-6 was heading back to his and Bencom's shared cell as the
13  inmates' break time was ending, defendant Lerma intercepted CW-6 and
14  instructed him, "Go ahead and let your cellie rest, he's a little bit
15  tired." (Dkt. 1717, 209:5-10; 211:17-24; 239:8-16.) CW-6 came back to
16  his and Bencom's shared cell to find his friend laying lifeless on
17  the bottom bunk.

18      CW-6 testified that defendants Lerma and Jose Valencia Gonzalez,
19  who roamed free as orderlies, came by and told him to "keep your
20  mouth shut," "stay quiet," remain with Bencom's body, and that
21  defendant Lerma would talk to him later. (Dkt. 1717, 215:21-217:19;
22  218:6-16.) CW-6 obeyed defendants Lerma's and Jose Valencia
23  Gonzalez's orders because he "didn't want to end up like [his]
24  cellie." (Dkt. 1717, 217:17-21.)

25      CW-6 noted that he observed Bencom unresponsive in his bunk and
26  saw he was stabbed in the chest and had injuries around his neck.
27  (Dkt. 1717, 213:8-11.) An emotional CW-6 stayed up the rest of the
28  night in Bencom's assigned bunk as he drank coffee and smoked

5

synthetic marijuana ("spice") provided to him by defendants Lerma and Jose Valencia Gonzalez.[3] (Dkt. 1717, 222:9-21.) MDC Corrections Officers came by at 4:00 p.m. and again at 10:00 p.m. but never required a standup count.[4] (Dkt. 1717, 220:8-14, 221:11-25; see also Dkt. 1716, 236:8-238:21.) That night, CW-3 testified that he tried to knock on the wall to Bencom to get his attention like they had previously done before, but Bencom never responded. (Dkt. 1715, 156:5-157:2.) Not until the following morning did defendant Jose Valencia Gonzalez give CW-6 permission to notify the guards of Bencom's body. (Dkt. 1717, 226:14-18; 227:19-22.)

Between 8:15 and 8:20 a.m., MDC Corrections Officer ("CO") Benito Pichardo opened cell 619 to find Bencom covered with a sheet and a "scared" and "nervous" CW-6 who told CO Pichardo to "check on my cellie." (Dkt. 1712, 95:12-24, 96:21-22, 99:4-7.) Upon further inspection, CO Pichardo notified the unit officer of the emergency. (Dkt. 1712, 99:15-25, 100:19-24.) CO Pichardo also noted that defendants Lerma and Jose Valencia Gonzalez were orderlies and

---

[3] The defense attempted to elicit testimony from a "spice" expert, Dr. Rohini Ranganathan, who admitted that she was: (1) not rendering an opinion as to whether anyone in the case was, in fact, under the influence of "synthetic cannabis"; (2) did not review any surveillance or photographs in the case; (3) never looked into whether the actual effects of the rise in synthetic cannabis has seen a corresponding rise in violence; and (4) had no certainty about the potency or dosage of synthetic cannabis in prison or the actual effect on the person. (Dkt. 1714, 139:16-145:15.) Instead, all she testified about was to "opine on the possibilities and the range of effects associated with synthetic cannabinoids and the relative strength compared to cannabis." (Id. at 146:22-147:5.)

[4] Several witnesses testified that the count is not uniformly enforced. For example, CW-6 testified that the correctional officers did not make him stand up for the count on the night of Bencom's murder. (Dkt. 1717, 8-14.) Both CW-6 and CW-4 testified that they did not always stand up for the "stand-up" count and CW-4 testified that not all correctional officers enforced the stand-up count or issued violations uniformly. (Dkt. 1717, 221:1-222:8; Dkt. 1716, 181:1-2, 232:19, 233:3-7, 234:17-19, 235:15-238:21.)

1  already in the common spaces before he began releasing inmates from

2  their cells on 6N for showers. (Dkt. 1712, 102:3-23, 103:5-23; see

3  also Dkt. 1713, 195:3-12, 196:8-10 (MDC Lt. Amaro testifying that

4  orderlies were generally allowed more access in common areas than

5  when the regular inmates would have to be inside their cells, and

6  during COVID-19 times, would be responsible for ensuring the housing

7  unit was as "clean as possible".)

8    **C.   With Bencom Dead, Defendant Sanchez Bragged to Inmates that**

9    **they "Handle Business" and Defendant Carlos Gonzalez Yelled "Don't Pray for Me, Pray for the Other Guy."**

10   After MDC guards removed Bencom's body, the inmates were ordered

11 to go into groups out to the basketball court while the guards

12 searched the 6N cells. (Dkt. 1715, 146:9-24.) There, CW-3 heard

13 defendant Sanchez excitedly yell to the group of at least 20 inmates,

14 "Don't mess with them, he did what he was supposed to do" and that

15 Sanchez was "upset that somebody else didn't do something." (Dkt.

16 1715, 151:6-8.) CW-3 further testified that Sanchez was bragging that

17 Sanchez and his associates "handled their business and he was upset

18 somebody else didn't." (Dkt. 1715, 151:8-12.)

19   After Bencom's death, several inmates were sent to the "hole"

20 (the Solitary Housing Unit or "SHU"), including defendant Carlos

21 Gonzalez. (Dkt. 1714, 203:13-17; Dkt. 1715, 71:7-12.) One inmate was

22 sent to the hole unrelated to Bencom's death. (Dkt. 1714, 204:5-8.)

23 CW-2 testified that he tried to check up on this inmate by

24 communicating through the jail vents. (Dkt. 1714, 203:16-24, 204:15-

25 17.) CW-2 told the inmate, "I will pray for you." (Dkt. 1714,

26 204:19.) Defendant Carlos Gonzalez, whose voice CW-2 recognized from

27 prior conversations, interjected and said, "don't pray for me, pray

28

for the other guy." (Dkt. 1715, 70:1-11; Dkt. 1714, 203:25-204:2,
205:2-4.)

> **D.    "Die Already, Why Aren't You Dying": Defendant Sanchez
> Admits to the Murder and Offers Graphic Details Only
> Otherwise Experienced by Bencom and Known by the Medical
> Examiner.**

After the murder, defendant Sanchez was transferred to the San
Luis Correctional Facility in Arizona and was housed in a common
dorm. (Dkt. 1717, 55:15-24, 56:23-57:14.) There, fellow inmate CW-5
met Sanchez, who asked CW-5 to join the jail's Southsider clique.
(Dkt. 1717, 57:1-4.) Later, CW-5 heard defendant Sanchez brag to
another inmate in the common dorm about the Bencom murder. CW-5
testified that defendant Sanchez "walked into the cell with two other
individuals and they choked him and stabbed him." (Dkt. 1717, 58:23-
59:1.) Notably, defendant Sanchez admitted, "they stabbed him in the
heart and in the eye and – while that was happening, [Sanchez] said
'die, why aren't you dying.'" (Dkt. 1717, 59:2-4.) Aside from CW-5
and the medical examiner,[5] no percipient witness testified as to
seeing the stab wound to Bencom's eye.

The evidence at trial supported defendant Sanchez's own
admission that multiple people committed Bencom's murder. Dr.
Lawrence Nguyen, the Los Angeles County Medical Examiner who
performed Bencom's autopsy, testified that he believed Bencom died
from the combined effects of stab wounds and ligature strangulation.
(Dkt. 1713, 81:1-6.) He testified that the ligature marks around

---

[5] The medical examiner testified that he did not notice the stab
wound to Bencom's eye – specifically the caruncle of the eye – until
he removed Bencom's skull cap and examined his brain.  (See Dkt. 1713
at 32:15-22-25, 33:1-5.)

1    Bencom's neck were more likely consistent with being strangled from

2    the front. (Dkt. 1713, 61:11-21, 62:19-20.)

3        Notably, Dr. Nguyen testified that he did not find markings

4    consistent with defensive wounds on Bencom, including scratching

5    one's own neck when being strangled, though based on the coloration,

6    he believed it was likely that Bencom was alive while being strangled

7    and also likely alive during the stab wounds to his chest. (Dkt.

8    1713, 64:22-65:14, 66:20-22, 67:18-19.)

9        CW-3, who was in the cell immediately next to Bencom's and CW-

10   6's, testified that he did not hear any signs of a struggle,

11   screaming, or a fight overnight coming from Bencom's cell. (Dkt.

12   1716, 119:13-120:6.) Indeed, Dr. Nguyen testified that he also

13   believed it was possible that two, three, or four people could have

14   committed Bencom's murder.[6] (Dkt. 1713, 137:11-20.)

15       FBI Forensic Examiner Amanda Bakker testified that no other

16   person's DNA was found underneath Steve Bencom's fingernails (Dkt.

17   1713, 155:21-25), which was consistent with being held down or

18   restrained by multiple people as he was being stabbed and strangled

19   to death.

20   **E.    Jury Verdict**

21       On March 28, 2025, a federal jury found defendants guilty on all

22   but one of the charged counts. (Dkt. 1747.) Specifically, the jury

23   found all defendants guilty on each murder count. This included the

24   RICO Conspiracy in Count One with the identical racketeering activity

25   of murder, extortion, and drug trafficking (Id., 2-6.); the VICAR

26

27       [6] Dr. Nguyen testified that he was not able to issue a time of
     death, and that the times proposed by both the government and
28   defendants were within the realm of possibility. (Dkt. 1713, 136:22-
     137:10.)

1    murder in Count Seven (Id., 7-10); and First-Degree Murder in Count
2    Eight (Id., 11-14.) Defendants Lerma and Jose Valencia Gonzalez were
3    separately found guilty in Count Ten for operating a heroin and
4    methamphetamine drug trafficking conspiracy. (Id., 15-16.) Defendant
5    Jose Valencia Gonzalez was guilty in Count Seventeen for Felon in
6    Possession of a Firearm and Ammunition (Id., 17), and defendant
7    Carlos Gonzalez was found guilty of the same in Count Eighteen. (Id.,
8    18.) The jury acquitted defendant Sanchez of Felon in Possession of a
9    Firearm and Ammunition in Count Nineteen. (Id., 19.)

10   **III. Rule 29**

11       **A.   Legal Standard**

12       "The hurdle to overturn a jury's conviction based on a
13   sufficiency of the evidence challenge is high." United States v.
14   Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010). The jury's verdict must
15   stand if, "viewing the evidence in the light most favorable to the
16   prosecution, any rational trier of fact could have found the
17   essential elements of the crime beyond a reasonable doubt." United
18   States v. Reed, 575 F.3d 900, 923 (9th Cir. 2009) (quotations
19   omitted). The sufficiency analysis for a Rule 29 motion is two-fold.

20       "First, a reviewing court must consider the evidence presented
21   at trial in the light most favorable to the prosecution." United
22   States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc)
23   (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). In so doing,
24   this Court "may not usurp the role of the finder of fact by
25   considering how it would have resolved the conflicts, made the
26   inferences, or considered the evidence at trial." Id. (citing
27   Jackson, 443 U.S. at 318-19). Indeed, "[c]ircumstantial evidence and
28   the inferences drawn from [the evidence at trial] may be sufficient

1    to sustain a conviction." United States v. Lewis, 787 F.2d 1318, 1323
2    (9th Cir. 1986). Thus, when "'faced with a record of historical facts
3    that supports conflicting inferences,' a reviewing court 'must
4    presume -- even if it does not affirmatively appear in the record --
5    that the trier of fact resolved any such conflicts in favor of the
6    prosecution, and must defer to that resolution.'" Nevils, 598 F.3d at
7    1164 (citing Jackson, 443 U.S. at 326, and McDaniel v. Brown, 558
8    U.S. 120, 132-34 (2010). "[T]he government does not need to rebut all
9    reasonable interpretations of the evidence that would establish the
10   defendant's innocence, or 'rule out every hypothesis except that of
11   guilt beyond a reasonable doubt.'" Nevils, 598 F.3d at 1164 (quoting
12   Jackson, 443 U.S. at 326). Only where "mere speculation, rather than
13   reasonable inference, supports the government's case, or where there
14   is a total failure of proof of a requisite element" is the evidence
15   legally insufficient. Id. at 1167 (citations, quotations, and
16   alterations omitted).

17       Second, because "[a] jury's verdict is not to be disturbed
18   lightly," United States v. Begay, 673 F.3d 1038, 1043 (9th Cir.
19   2011), and is afforded "great deference," United States v. Pelisamen,
20   641 F.3d 399, 409 n.6 (9th Cir. 2011), "the reviewing court must
21   [next] determine whether this evidence . . . is adequate to allow
22   'any rational trier of fact [to find] the essential elements of the
23   crime beyond a reasonable doubt.'" Nevils, 598 F.3d at 1164 (quoting
24   Jackson, 443 U.S. at 319 (emphasis and alteration in original)); see
25   also United States v. Solorio, 669 F.3d 943, 954-56 (9th Cir. 2012)
26   (even where there was a "major gap" in evidence relating to one
27   required element and "facts could certainly support an inference"
28   that the element was unsatisfied, "the record as a whole" and the

11

1   "'great deference'" accorded jury verdicts precluded court from
2   setting guilty verdict aside). "At this second step, ... a reviewing
3   court may not 'ask itself whether it believes that the evidence at
4   the trial established guilt beyond a reasonable doubt,' only whether
5   'any' rational trier of fact could have made that finding." Nevils,
6   598 F.3d at 1164 (quoting Jackson, 443 U.S. at 318-19) (emphasis in
7   original).

8        **B.   Defendant Lerma's Rule 29 Motion (Dkt. 1804).**

9        Defendant Lerma contends the government failed to present
10  sufficient evidence of defendant Lerma's involvement in the
11  enterprise or the charged offenses. Specifically, defendant Lerma
12  states the following: (1) the totality of the physical evidence more
13  likely favors an innocent explanation; (2) the Mexican Mafia roll
14  call sheet is fake and CW-1 lied about its origins; (3) CW-6's
15  testimony is contradicted by newly discovered and precluded evidence
16  and was self-serving; and (4) CW-2, CW-3, and CW-4's testimony were
17  not credible. (Dkt. 1804 at 16-18.) Defendant Lerma is wrong.

18       Defendant Lerma blatantly ignores the standard for a Rule 29
19  claim. Specifically, defendant Lerma ignores that evidence must be
20  viewed "in the light most favorable to the prosecution." Nevils, 598
21  F.3d 1158. A Court "cannot second-guess the jury's credibility
22  assessments" when evaluating a Rule 29 motion. Id. at 1170.
23  Defendant Lerma asks for this Court to step outside of its role and
24  make credibility findings that were explicitly rejected by the jury.
25  Moreover, defendant Lerma asks for this Court to take into
26  consideration evidence that was never presented at trial, let alone
27  in the government's case, namely, statements made (but not in a sworn

28

declaration) by Lamont Devault and Arthur Estrada, to counsel or their investigator.[7]

When examined in the light most favorable to the government, the evidence presented in the government's case-in-chief was sufficiently adequate to allow a rational trier of fact to find "the essential elements of the crime beyond a reasonable doubt" for the crimes committed by defendant Lerma. Id. (cleaned up).

Defendant Lerma was the head of a Mexican Mafia enterprise. CW-6, a member of this enterprise, explicitly testified to the hierarchy of this enterprise, as well as Lerma dominance over others as the boss. CW-6 testified to conversations he had with defendant Lerma's secretary – Cheryl Perez-Castaneda – where she explicitly told him that the money he was taxing and collecting was owed to defendant Lerma. (Dkt. 1717 at 114:9-16, 115:21-24, 126:12-23, 127:19-22.) This is corroborated by the ledgers, money orders and letters showing a connection between defendant Lerma, Perez-Castaneda, and her daughter Trisha Perez found at her Cherryville criminal street gang-adorned house, and deposits into defendant Lerma's JPay accounts by both Perez-Castaneda and Trisha Perez. Gov't Trial Exhibits 350, 352, 357, 360-362.

Another associate of defendant Lerma and Mexican Mafia associate, CW-1, testified to the actions he specifically did for defendant Lerma on behalf of his enterprise. This included violent assaults, drug dealing, and taxing. (See, e.g., Dkt. 1711 at 108:15-19, 134:2-22.) As part of his work for the Mexican Mafia as a whole, CW-1 drafted a list of Mexican Mafia members and addresses to assist

---

[7] The government objects to this Court taking into consideration any of these statements in its Rule 29 analysis.

13

1  in facilitating correspondence to them once he was released from

2  custody. (Id. at 118:10-25-119:1-7; Gov't Trial Exhibits 163, 168.)

3  Defendant's sole argument regarding the list is an insistence that it

4  is fraudulent. (Dkt. 1804 at 17.) In support of this, defendant

5  improperly cites evidence not presented at trial, namely, answers by

6  Arthur Estrada to questions posed by counsel. (Dkt. 1804 at 10-11.)[8]

7      Simply put, the evidence presented at trial was that CW-1

8  created this list for the purpose of facilitating Mexican Mafia

9  enterprise-related correspondence. The roll call was admitted into

10 evidence and the jury found CW-1 credible, as demonstrated by the

11 verdict.  Nothing identified by defendant detracts from this, let

12 alone in a manner that would only result in an inference of

13 innocence.

14     Finally, there is the nature of the enterprise itself. The

15 government's enterprise expert, Detective Devon Self, testified

16 extensively about the history and makeup of the Mexican Mafia. The

17 acts testified to at trial, including ownership of territory, the

18 hierarchy of the enterprise's members, the criminal acts done in

19 furtherance of the enterprise, and the tattoos, were all consistent

20 with how a Mexican Mafia-based enterprise is operated. Gov't Exhibit

21 A - Feb. 26, 2025 Trial Transcript. Moreover, on cross-examination,

22 FBI Special Agent Joseph Talamantez was directly asked by defendant

23 Lerma's counsel about Mexican Mafia members he has investigated. In

24

25 _____

26     [8] The government notes that the declaration is not a declaration
   from Mr. Estrada, but rather, from counsel, documenting their
   questions. In the event this Court determines an evidentiary hearing
27 would be needed, the government would object to any of Mr. Estrada's
   statements being admitted as, in their current state, they are simply
28 a workaround the requirement of providing declarations from sworn
   parties.

14

1   response, and without any objection, Agent Talamantez identified

2   defendant Lerma as a Mexican Mafia member he has investigated.)Dkt.

3   1738 at 258:7-14.)[9]

4       Because the government's evidence showed defendant Lerma was a

5   member of the Mexican Mafia, was the head of the enterprise, and was

6   involved in the underlying acts benefiting the enterprise – including

7   ordering the vicious and brutal murder of a Sureño – this Court

8   should deny defendant Lerma's Rule 29 motion.

9       **C.   The Evidence in the Light Most Favorable to the Government
        Supports the Denial of Defendant Jose Valencia Gonzalez's**

10      **Joint Rule 29 and Rule 33 Motions (Dkt. 1799).**

11      Defendant Jose Valencia Gonzalez moves for a judgment of

12  acquittal under Rule 29 as to the murder Counts One, Seven, and

13  Eight, or alternatively for a new trial under Rule 33. (Dkt. 1799 at

14  3.) The bulk of defendant's Rule 29 arguments raise: (1) the lack of

15  forensic evidence and eyewitness testimony at trial; (2) target the

16  reliability of the cooperating witnesses for the government; and (3)

17  relitigating defense expert Dr. Melinek's time of death calculation.

18  (Id. at 4-5.) Defendant's arguments under Rule 33 are largely

19  recycled from his Rule 29 arguments and argues a new trial is

20  warranted because of "unreliable testimony from inmate witnesses,

21  failure to produce critical video evidence, [and] failure to use

22  available DNA databases." (Id. at 6.) Without articulating how,

23  ─────────────────

24      [9] Q: You testified earlier that there were -- you have
        investigated 5 to 10 Mexican Mafia members, meaning not just

25      associates the actual members. Who are those 5 to 10?

26      A: Jose Landa-Rodriguez.

        Q: What is his moniker?

27      A: Fox. Michael Lerma, "Pomona Mike," a defendant here. Luis

28  Vega, "Little One" Vega [. . . .].

                                    15

1   defendant also argues "cumulative error and prejudice." (Id.)

2   Defendants Carlos Gonzalez and Lerma join in this motion. (Dkts.

3   1808, 1809.)

4        None of these arguments support entering a judgment for

5   acquittal, especially given such compelling eyewitness testimony of

6   defendant Jose Valencia Gonzalez's strong motive to kill Bencom over

7   a drug debt, his coordinated movements to accomplish that goal seen

8   in surveillance video and through eyewitness accounts that placed him

9   and the remaining defendants with Bencom in his last moments seen

10  alive, testimony of how defendant Jose Valencia Gonzalez washed his

11  hands after the stabbing and strangulation of Bencom, and the

12  defendants' admissions to the conspiracy.

13       Defendant erroneously argues the absence of physical evidence

14  warrants acquittal but fails to articulate why the lack of physical

15  evidence conflicts with the jury's verdict, more so in light of the

16  totality of the evidence. Instead, when reviewed in a light most

17  favorable to the government, the evidence presented at trial

18  demonstrates defendant Jose Valencia Gonzalez and the joined

19  defendants were active participants in the murder of Bencom.

20       Defendant first focuses on the lack of physical and forensic

21  evidence such as DNA, fingerprints, and blood evidence to tie

22  defendant Jose Valencia Gonzalez to the murder. (Dkt. 1799 at 4.)

23  This draws a legally inconsequential distinction between direct

24  evidence and the government's ample circumstantial evidence

25  highlighted above. As explained in Ninth Circuit pattern jury

26  instructions, "[t]he law makes no distinction between the weight to

27  be given to either direct evidence or circumstantial evidence." Ninth

28  Circuit Model Jury Instr. No. 1.5. As is often the case, criminal

16

conspiracy and murder can often only be demonstrated through
circumstantial evidence. The government was never required to prove
this case through a defendant's forensics or eyewitness testimony
from inside Bencom's jail cell when a jury could simply infer the
same through 6N surveillance video and inmate witnesses.

Moreover, 6N's limited universe of suspects, the dormitory-style
comingled living, and the defendants' prior custodial relationship
with Bencom only reduces the probative value of such forensic
evidence the defense desires. Instead, it was the defendant Jose
Valencia Gonzalez's own statements prior to the murder, the debt, the
coordinated movement, the mechanics of the murder showing multiple
perpetrators, and defendant Jose Valencia Gonzalez washing his hands
of the murder that proved his guilt beyond a reasonable doubt. Each
of the joined defendants in the motion, defendants Carlos Gonzalez
and Lerma, were also overheard making inculpatory and consequential
statements that were presented to the jury. The absence of a certain
type of evidence fails in light of the evidence that the government
presented to the jury and was summarized in the government's
Statement of Facts. (Supra 2-9.)

The defense next targets the motives of the government's
cooperators – CW-2, CW-3, and CW-6 -- which is a veiled attempt to
impugn their testimony and relitigate their credibility at the trial.
(Dkt. 1799 at 5-6.) However, the credibility of witnesses is beyond
the scope of this Court's review under Rule 29. Nevils, 598 F.3d at
1170; United States v. Alarcon-Simi, 300 F.3d 1172, 1176 (9th Cir.
2002) ("[I]t is not the district court's function to determine
witness credibility when ruling on a Rule 29 motion."). Moreover,
each defendant's ultimately unsuccessful strategy at trial sought to

17

1   impeach the credibility of these witnesses but in his Rule 29 motion,

2   defendant Jose Valencia Gonzalez fails to articulate how his

3   arguments overcome all reasonable interpretations of the evidence

4   that proved the defendants' guilt.

5       Lastly, defendant Jose Valencia Gonzalez argues the contrary

6   medical evidence of Bencom's time of death as Dr. Judy Melinek

7   testified somehow "contradicts the government's timeline." (Dkt. 1799

8   at 5.) As the law requires, the "[c]onflicting evidence is to be

9   resolved in favor of the jury verdict," that defendant is guilty.

10  United States v. Corona-Verbera, 509 F.3d 1105, 1117 (9th Cir. 2007)

11  (cleaned up). It was the "exclusive function of the jury to [...]

12  resolve evidentiary conflicts." United States v. Ramirez-Rodriguez,

13  552 F.2d 883, 884 (9th Cir. 1977). Contrary to Dr. Melinek's time of

14  death calculation were Dr. Nguyen's opinions for the government that

15  "[r]igor mortis for determining time of death is notoriously

16  difficult" and that he typically would not rely on that to determine

17  the time of death. (Dkt. 1713 at 73:17-22.) The conflicting

18  calculations by these experts are resolved in favor of the jury's

19  verdict.

20      After viewing the evidence in the light most favorable to the

21  prosecution, the question of whether any rational factfinder could

22  have found the essential elements of the crimes beyond a reasonable

23  doubt is easily met.

24      Defendant's Rule 33 arguments are the same as his Rule 29

25  arguments and fail to establish this as an exceptional case deserving

26  of a new trial. The jury heard counsels' impeachment evidence of the

27  government's cooperating witnesses, the jury heard the Court's jury

28  instructions specifically as to how to evaluate the testimony of

18

1   cooperator witnesses, and then heard counsels' arguments about

2   cooperator credibility in closing arguments but still found the

3   defendants guilty. The witnesses ultimately testified in line with

4   the available surveillance video from MDC 6N that captured the

5   coordinated movements of the victim and defendants at the time of the

6   victim's death. Each defendant's statements expressing a motive to

7   kill or consciousness of guilt were also admitted at trial. There is

8   no basis for a new trial on the recycled claims defendant Jose

9   Valencia Gonzalez puts forth.

10      **D.    Sufficient Evidence Supports Carlos Gonzalez's Convictions
               on Counts One, Seven, and Eight (Dkt. 1800).**

11

12      Defendant Carlos Gonzalez asks this Court to discard the jury's

13  carefully considered guilty verdicts as to Counts One, Seven, and

14  Eight despite the overwhelming evidence that he was a foot soldier

15  for the Michael Lerma Cell of the Mexican Mafia, the Lerma Cell's

16  stronghold over 6N and beyond, multiple witnesses' testimony, the

17  video surveillance, and medical examiner testimony about Bencom's

18  murder. There was sufficient evidence to support defendant Carlos

19  Gonzalez's convictions for the RICO conspiracy, murder in aid of

20  racketeering, and first-degree murder. Therefore, the Court should

21  deny defendant Carlos Gonzalez's motion.

22      Because defendant Carlos Gonzalez concedes the jury's verdict as

23  to Count One, with the exception of the special finding as to murder,

24  and incorrectly argues there was insufficient evidence of

25  willfulness, deliberateness, premeditation, aiding and abetting, and

26  knowing or contemplating that the conspiracy would engage in a

27

28

1  pattern of racketeering as to murder, the government only focuses on

2  the facts addressing those issues. (See, e.g., Dkt. 1800 at 5, 14.)[10]

3          1.   The Evidence Showed that Defendants Acted with
              Premeditation, Deliberateness, and Willfulness and
4             that Defendant Carlos Gonzalez Knew or Contemplated
              that the Conspiracy Would Engage in Murder.
5

6      Four men walked into Bencom's cell. Only three men walked out.

7  Defendant Lerma watched his plan fall into place as he surveilled his

8  three trusted associates walk into the cell of the man who had owed

9  him a drug debt. (Dkt. 1714 at 42:19-43:8.) The evidence at trial

10 showed that defendant Sanchez first lured Bencom to his cell with the

11 promises to have ingredients to make pruno. (Dkt. 1717 at 205:5-

12 206:25.) Once the first part of the plan was in place, defendant

13 Carlos Gonzalez and Jose Valencia Gonzalez exited their cell and

14 immediately headed straight down the hallway toward Bencom's cell.

15 (Dkt. 1714 at 39:22-40:19; Dkt. 1717 at 209:11-22.) CW-6 testified

16 that he saw Sanchez push Bencom into his cell, with Carlos Gonzalez

17 and Jose Valencia Gonzalez following behind into the cell. (Dkt. 1717

18 at 209:11-22.) CW-3 likewise corroborated that he saw Carlos

19 Gonzalez, Jose Valencia Gonzalez, and Sanchez follow Bencom into his

20 cell. (Dkt. 1715 at 123:9-21.) Surveillance video showed Lerma

21 lurking from a distance staying focused toward his co-defendants.

22 (Dkt. 1714 at 42:19-8.) Defendant Lerma ultimately zeroed in on cell

23 619--toward his criminal associates who outnumbered Bencom in his own

24 cell. (Dkt. 1714 at 43:12-18.)

25

26

27

28      [10] Defendant Carlos Gonzalez also concedes there was sufficient
   evidence to support his felon-in-possession of a firearm and
   ammunition conviction.

1  Despite the evidence of defendants' choreographed effort,

2  defendant Carlos Gonzalez argues the evidence was insufficient to

3  show willfulness, deliberateness, and premeditation, or that he knew

4  or contemplated that the conspiracy would engage in murder.

5  But the evidence did not stop there. CW-3 testified that

6  defendants Carlos Gonzalez, Valencia Gonzalez, and Sanchez were in

7  Bencom's cell for about 10-15 minutes.[11] (Dkt. 1715 at 128:20-24;

8  130:5-14.) He also testified that another inmate prevented him and

9  his cellmate from walking down the hallway toward Bencom's cell,

10  while defendants Carlos Gonzalez, Jose Valencia Gonzalez, and Juan

11  Sanchez were in there with Bencom, and that the inmate re-directed

12  CW-3 and CW-3's cellmate elsewhere. (Dkt. 1715 at 125:10-128:15.)

13  Viewed in the light most favorable to the government, the evidence

14  showed that defendants had a plan when luring and pushing Bencom into

15  his cell, and not allowing other inmates to travel down that hallway

16  while they outnumbered him in a cell toward the end of the hallway,

17  which also negates any argument that defendants were merely present

18  in 6N at the time of the murder.

19

20        2.    Defendants Murdered or Aided and Abetted the Murder of Bencom.

21  The jury also heard sufficient evidence to support a finding

22  that Bencom's murder was committed by multiple actors--defendant

23

24      [11] Defendant Carlos Gonzalez tries to discredit CW-3 testimony because they claim that their witness, Roy Gravette, a man who stands

25  at 6'3", could not see cell 619 from his view from the telephones. (Dkt. 1719 at 139:24-140:9.) But at least two witnesses, including

26  CW-3 and Amaro, testified that either they could see down to 619 from the phones or that it was possible to see cell 619 from that vantage

27  point. (Dkt. 1716 at 112:18-113:8; Dkt. 1713 at 229:4-12.) In contrast, as to the defense's photographic exhibit, CW-3 testified

28  that that vantage point was not the view he had when he could see down to cell 619. (Dkt. 1716 at 112:7-113:8.)

Lerma's foot soldiers--and not just by one inmate as defendants argued. The jury heard evidence that Bencom had been strangled, stabbed twice in the heart, and stabbed in the eye—-a murder consistent with being attacked by multiple people. (See Dkt. 1712 at 239:2-8, 18-25, 240:1-4.) CW-3 and CW-4 testified that they saw only the three men walk out of the cell: defendants Carlos Gonzalez, Jose Valencia Gonzalez, and Juan Sanchez, but not Bencom. (Dkt. 1715 at 128:18-22, 130:12-14; Dkt. 1716 at 175:5-9.)

Dr. Nguyen testified that he believed Bencom died from the combined effects of stab wounds and ligature strangulation. (Dkt. 1713 at 81:1-6.) Notably, he testified that he did not find markings consistent with defensive wounds, including scratching one's own neck when being strangled, though based on the coloration, he believed it was likely that Bencom was alive while being strangled and also likely alive when he was stabbed in the chest. (Dkt. 1713 at 64:22-65:14, 66:20-22, 67:18-19.) Dr. Nguyen testified that the ligature marks around Bencom's neck were more likely consistent with being strangled from the front. (Dkt. 1713 at 61:11-21, 62:19-20.) Finally, Dr. Nguyen testified that he believed it was also possible that two, three, or four people could have murdered Bencom. (Dkt. 1713 at 137:11-20.)

FBI Forensic Examiner Amanda Bakker testified that no other person's DNA was found underneath Bencom's fingernails (Dkt. 1713 at 155:21-25), which was consistent with Bencom being held down by multiple people as he was being murdered. All of this is consistent with the methods and means used by the enterprise and described by CW-1 and CW-6 to discipline those that disobey its rules, be it through a vicious beating, or, in this case, murder, including by

22

1    using multiple people to discipline an inmate or to restrain a

2    subject prior to stabbing them.

3        And while defendants tried to argue that CW-6 killed Bencom, CW-

4    3 testified that he did not hear any signs of a fight or struggle

5    between the two when he was in his cell next door. (Dkt. 1716 at

6    119:13-120:6.) Contrary to defendants' argument about the absence of

7    forensic evidence, sufficient evidence supported the jury's findings

8    as to murder.

9            3.    Defendants Try to Conceal the Murder.

10        After defendants Carlos Gonzalez, Jose Valencia Gonzalez, and

11    Juan Sanchez left Bencom's cell, CW-4 testified that he saw defendant

12    Lerma try to open the door to Bencom's cell but abandoned his efforts

13    to open the door when he realized he was being watched by other

14    inmates. (Dkt. 1716 at 178:5-9, 14-24.)

15        Before returning to his cell, CW-6 testified that defendant

16    Lerma told him to leave his cellmate alone because his cellmate was

17    "tired." (Dkt. 1717 at 209:5-10; 211:17-24; 239:8-16.) CW-6 further

18    testified about finding his cellmate and friend's body on the bottom

19    bunk, which was not his usual bed. (Dkt. 1717 at 211:23-24, 216:10-

20    12.) CW-6 told the jury about defendant Lerma and Valencia Gonzalez

21    (defendant Carlos Gonzalez's brother), two men who held immense power

22    within 6N, ordering him to stay quiet and forbade him from alerting

23    the guards about his deceased friend until they gave him permission

24    to do so. (Dkt. 1717 at 215:21-217:21; 218:6-16.)

25        Defendant argues that there was insufficient evidence because

26    the murder weapons were not found, nor was Carlos Gonzalez's DNA or

27    blood found. But defendants Lerma and Valencia Gonzalez, along with

28    other Sureños, were entrusted as orderlies in 6N, which gave them

                                    23

heightened access within the jail during times when inmates were ordinarily restricted to their cells, and enabled them to dispose of any garbage and keep 6N as clean as possible (Dkt. 1713 (Amaro) at 195:3-196:10, 207:6-8; Dkt. 1714 (Marroquin) at 48:20-49:8, 84:15-19); Dkt. 1714 (CW-2) at 167:22-168:4, 201:7-203:7 (noting that while defendants Lerma and Jose Valencia Gonzalez were both orderlies with more access compared to other inmates, it was unusual for defendant Valencia Gonzalez to be running the showers the morning that Bencom's body was discovered); Dkt. 1712 (Pichardo) at 102:3-103:22, 104:21-105:2); Dkt. 1717 (CW-6) at 162:8-24 (describing defendant Lerma as leader of the Sureños in 6N and controlled everything from who was allowed to be an orderly, who sold the drugs, and who ordered the disciplines), thus allowing them the opportunity to discard evidence of the murder before ultimately allowing CW-6 to alert the guards as to Bencom's death.

CW-3 also testified that he saw defendant Jose Valencia Gonzalez washing something in the sink after returning from Bencom's cell. (Dkt. 1715 at 131:20-25.) Overall, defendant Carlos Gonzalez's arguments are insufficient to overturn the jury's carefully considered verdicts.

> 4.    Defendant Lerma Made the Rules and Defendants Carlos Gonzalez, Jose Valencia Gonzalez, and Juan Sanchez Were the Enforcers.

Defendants were not just merely present in 6N. The evidence at trial showed that defendant Lerma was in charge of 6N: he collected a third of drug trafficking and other illegal proceeds there and elsewhere (Dkt. 1711 at 197:13-21, 203:4-8, Dkt. 1714 at 150:16-17, 172:12-18); he controlled who could fight and when (Dkt. 1714 at 189:24-192:1); and he had defendants Carlos Gonzalez, Jose Valencia

24

Gonzalez, and Juan Sanchez serve as his enforcers. (See, e.g., Dkt. 1714 at 196:17-23.) Defendants created and maintained a climate of fear to increase the power of the Michael Lerma Cell of the Mexican Mafia. (See, e.g., Dkt. 1715 at 151:8-12, Dkt. 1714 at 203:25-204:2, 205:2-4.)

Witnesses testified that they had seen defendants Carlos Gonzalez, Jose Valencia Gonzalez, and Juan Sanchez, among others, inflict violence against inmates using the same modus operandi of multiple Sureños against one. (Dkt. 1716 at 165:14-169:4; Dkt. 1714 at 188:16-19, 189:24-199:6.) CW-6 testified that defendant Jose Valencia Gonzalez stabbed him multiple times at Lerma's orders or that he had seen people getting stabbed or beaten up for owning money to defendant Lerma. (Dkt. 1717 at 160:10-18, 168:4-178:23.) CW-2 also testified that defendant Lerma was the one who had the power to order discipline and ordered such physical discipline against CW-2. (Dkt. 1714 at 189:24-190:6, 193:2-12.) CW-4 testified that he had seen defendants Carlos Gonzalez, Juan Sanchez, Jose Valencia Gonzalez, and Mike Lerma assault two inmates on two different occasions. (Dkt. 1716 at 165:14-169:4.) CW-1 also discussed committing multiple violent assaults with Valencia Gonzalez and others at Lerma's orders. (Dkt. 1711 at 140:2-3, 182:15-184:25, 186:7-189:22, 190:10-12, 191:15-20, 193:20-195:11, 195:24-196:8.)

Moreover, CW-1 testified about the potentially lethal consequences of owing a drug debt to defendant Lerma. (Dkt. 1711 at 213:1-3, 7-10, 18-23.) Several witnesses testified that when someone violated defendant Lerma's rules, he would use his trusted associates, to inflict discipline on his behalf. (Dkt. 1711 at 182:16-21, 184:1-25, 186:7-25, 190:10-12, 191:15-20, 193:20-25.)

25

1  Indeed, CW-1 recounted that people could get killed for owing $200 or

2  $300 (Dkt. 1711 at 213:23), whereas here, Bencom owed defendant Lerma

3  substantially more than that figure, with debts estimated at $1,200

4  and $2,400, among others. (See Dkt. 1715 at 60:10-61:9.)

5      Despite being in the SHU after Bencom's murder, defendant Carlos

6  Gonzalez continued cultivating a climate of fear and power at MDC.

7  CW-2 testified that after Bencom's murder, he heard defendant Carlos

8  Gonzalez yell into a vent, "don't pray for me, pray for the other

9  dude," in reference to Bencom.[12] (Dkt. 1714 at 203:25-205:4; Dkt. 1715

10  at 70:1-15, 71:10-19.)

11      Based on all of this evidence, and in a light most favorable to

12  the prosecution, there was sufficient evidence for the jury to find

13  defendants guilty of Counts One (including the special finding

14  related to murder), Seven, and Eight. The Court should deny defendant

15  Carlos Gonzalez's motion for an acquittal.

16  **IV.  Rule 33**

17      **A.  Legal Standard**

18      Rule 33 provides that "upon the defendant's motion, a court may

19  vacate any judgment and grant a new trial if the interest of justice

20

21  _____

22  [12] Defendant Carlos Gonzalez is correct in stating that as a result of the defendants' motion in limine, CW-5 was precluded from

23  testifying about what he had overheard from defendant Sanchez as Sanchez outed "Popeye" (Carlos Gonzalez) as one of two other people

24  who helped him with the murder, and was similarly precluded from naming "Pops" (Mike Lerma) as the one who ordered it. (See generally

25  Dkt. 1800 at 11; Dkt. 1717, at 43:23-44:6.) But CW-5 was able to testify at trial that he overheard defendant Juan Sanchez admit he

26  "walked into the cell with two other individuals and they choked him and stabbed him. He said they stabbed him in the heart and in the eye

27  and – while that he was happening, he said die, why aren't you dying." (Dkt. 1717 at 58:23-59:4, 60:9-12.) Defendant Sanchez's admission is also consistent with the evidence that Bencom's murder

28  was physically committed by three people, not one, as defendants argue.

26

so requires." Fed. R. Crim. P. 33(a). Because a verdict is presumptively valid, a new trial "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." United States v. Pimentel, 654 F.2d 538, 545 (9th Cir. 1981) (cleaned up). "It is only when it appears that an injustice has been done that there is a need for a new trial 'in the interest of justice.'" United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).

Although the Rule 33 analysis does not require the same level of deference as Rule 29, the "exceptional" nature of the Rule 33 remedy requires a court take great care in assessing the evidence.  A reviewing court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020) (reversing district court's granting of Rule 33 motion) (internal quotation and citation omitted). Indeed, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." Id.

Courts consistently follow these principles in granting Rule 33 motions "sparingly and with caution, doing so only in those really exceptional cases." United States v. Martinez, 763 F.2d 1297, 1313-14 (11th Cir. 1985); see also, e.g., United States v. LaVictor, 848 F.3d 428, 455-56 (6th Cir. 2017) (Rule 33 motions "granted only in the extraordinary circumstances where the evidence preponderates heavily against the verdict") (cleaned up); United States v. Wheeler, 753 F.3d 200, 208 (D.C. Cir. 2014) ("[G]ranting a new trial motion is

1  warranted only in those limited circumstances where 'a serious

2  miscarriage of justice may have occurred.'") (citation

3  omitted); <u>United States v. Reed</u>, 875 F.2d 107, 114 (7th Cir. 1989)

4  (reversing grant of Rule 33 motion where case was "not one of those

5  'exceptional cases' where the evidence preponderates so heavily

6  against the defendant that it would be a manifest injustice to let

7  the guilty verdict stand").

8      **B.   Defendant Lerma's, Carlos Gonzalez's, Jose Valencia**

9          **Gonzalez's, and Juan Sanchez's Rule 33 Motions (Dkt. 1803, 1804, 1805, 1807, 1808, 1809).**

10     A defendant needs to satisfy a five-part test to prevail on a

11  motion for a new trial based on newly discovered evidence. They

12  include: (1) the evidence must be newly discovered; (2) the failure

13  to discover it sooner cannot be due to lack of diligence; (3) it must

14  be material; (4) it cannot be cumulative or merely impeaching; and

15  (5) the introduction of the evidence would probably result in an

16  acquittal at new trial. <u>United States v. Kulcyzk</u>, 931 F.2d 542, 548

17  (9th Cir. 1991).

18     For objections to Court rulings, a defendant must demonstrate

19  that the Court's rulings or exclusion of witnesses "preponderates

20  heavily against the verdict [such] that a serious miscarriage of

21  justice may occur," or led to defendant being "unduly harmed or his

22  trial made unfair by the erroneous admission or exclusion of

23  evidence." <u>United States v. A. Lanoy Alston, D.M.D., P.C.</u>, 974 F.2d

24  1206, 1211 (9th Cir. 1992); <u>United States v. Johnson</u>, 337 F.3d 180,

25  203 (4th Cir. 1964).

26         1.   <u>Defendants' New Evidence Lacks Credibility.</u>

27     At the outset, this Court should disregard defendants' newly

28  discovered evidence for lacking credibility and should deny an

28

evidentiary hearing on the matter. See United States v. Diggs, 649
F.2d 731, 740 (9th Cir. 1981), overruled on other grounds in United
States v. McConney, 728 F.3d 1195 (9th Cir. 1984); United States v.
Panza, 612 F.2d 432, 441 (9th Cir. 1979). Defendants' new evidence
consists of: (1) a declaration by Daniel Navarro, an inmate recently
convicted of six federal child sex offenses who repeatedly lied on
the stand at his trial, and is awaiting sentencing; (2) a declaration
by Johnny Macias, an inmate facing drug trafficking charges;[13] (3) a
public document created in 2011; and (4) unsworn statements by Arthur
Estrada, a non-cooperating Mexican Mafia member asked about publicly
disclosing Mexican Mafia identifying information. This Court should
review this "newly discovered" evidence in its totality and determine
they lack credibility given the significant biases and incentives of
Navarro[14] and Macias, the timing of their statements, the stretch in
logic and speculation of tying the 2011 Mexican Mafia posting to
anything presented at this trial, and the lack of a sworn statement
by Arthur Estrada.

> 2. Defendants' New Evidence is Neither Newly Discovered
> nor Diligently Obtained.

Even if this Court entertained the proffered evidence, none of
it is newly discovered. Counsel have failed to present anything
before this Court explaining why they were unable to secure
statements from Mr. Navarro or Mr. Macias during trial. Nothing has

---

[13] The government is unaware at this time if Mr. Navarro and Mr.
Macias would assert their Fifth Amendment rights if asked to testify
at an evidentiary hearing.

[14] It strains credulity that CW-6 would purportedly confess to
the murder of Bencom to Navarro, a man who was then awaiting trial
for sex offenses with an underage girl, and would seek Navarro's
advice regarding legal strategy as well as Navarro's physical
protection. (See Dkt. 1803 ¶¶ 15, 17.)

1   been presented before this Court indicating that either inmate was

2   unavailable or incapacitated. Simply put, there was an opportunity to

3   discover this evidence, including during the week this Court was dark

4   to address one of the co-defendant's health concerns. Defendants fail

5   to address why no one was interviewed until long-after the jury's

6   verdict or why they were unable to do so.[15]

7       Similarly, defendant Lerma has had ample opportunity to access

8   and review the 2011 Mexican Mafia listing and interview Mr. Estrada.

9   Counsel's failure to find the former – a publicly available document

10  – shows a lack of diligence. Likewise, counsel's erroneous belief

11  that Mr. Estrada was dead when he was, in fact, alive and available

12  to be interviewed before and during the trial, also shows a lack of

13  diligence. See United States v. Harrington, 410 F.3d 598, 601 (9th

14  Cir. 2005) (noting the evidence "could have been obtained at any

15  time"); cf. United States v. Valverde-Rumbo, 2017 WL 3895789, at *7

16  (N.D. Cal. Sept. 6, 2017) (finding due diligence when defendant could

17  not locate reports due to counsel and investigator having the

18  incorrect name for a pertinent subject); United States v. Gordon, 246

19  F. Supp. 522, 524-25 (D.D.C. 1965) (similar).

20          3.   The "Newly Discovered" Evidence is Immaterial
                 Impeachment Evidence and Would Not Result in an
21               Acquittal.

22      Regardless of counsel's diligence, the newly discovered evidence

23  is, at best, impeachment material that is insufficient to warrant a

24  new trial. See United States v. Davis, 960 F.2d 820, 825 (9th Cir.

25

26      [15] Defendants have the burden of establishing that evidence is
    newly discovered and warrants a new trial. Defendants have not
27  provided this Court any information on this matter in its motions.
    The government objects to defendants attempting to cure this
28  significant omission in a reply brief, thus depriving the government
    the opportunity to respond.

                                      30

1992) (finding that while new impeachment evidence typically is not material for a new trial motion, there are certain select situations where it can be considered if it "could render the witness' testimony totally incredible.") A situation where impeachment evidence would result in a new trial is where a "witness' testimony were uncorroborated and provided the only evidence of an essential element of the government's case." Id.

The declarations of Mr. Navarro and Mr. Macias, as well as the statements of Mr. Estrada and the Mexican Mafia list, are impeachment evidence only. Neither Mr. Navarro nor Mr. Macias are a percipient witness and would only serve to impeach CW-6's denial to murdering Bencom and to impeach his credibility regarding any biases he purportedly harbored towards the defendants. Likewise, Mr. Estrada and the public intelligence listing would only serve to impeach CW-1's statements regarding his creation of a list of Mexican Mafia members. This is not one of the few select circumstances suggested by Davis where such impeachment evidence would render CW-6's testimony incredible.

First, all four defendants vigorously cross-examined CW-6 and CW-1 regarding their biases, motives, inconsistent statements, credibility, drug use, and prior convictions, as well as CW-6's movements, drug use, tattoos, and access to potential murder weapons. All of this was taken into consideration by the jury when they returned a guilty verdict.

Second, the defense presented significant evidence to undermine CW-6's statements, including a medical examiner expert witness, a synthetic cannabinoids expert witness, and BOP witnesses discussing the stand-up count procedures.

1        <u>Third</u>, CW-6's testimony was neither uncorroborated nor the only

2    evidence of defendant Lerma's Mexican Mafia enterprise affiliation

3    and leadership, defendant Lerma's involvement in the RICO predicate

4    acts, or defendant Lerma's involvement in the murder of Bencom.

5    Throughout the trial, the jury heard overwhelming evidence of

6    defendant Lerma's involvement in these acts, including jail calls

7    implicitly referring to him, correspondence between him and his

8    associates, testimony from CW-1 and the acts he did on behalf of

9    defendant Lerma, expert testimony regarding the Mexican Mafia,

10   percipient witnesses and surveillance footage that showed defendant

11   Lerma walking towards Bencom's jail cell along with the other

12   defendants, medical examiner testimony confirming Bencom's time of

13   death could have occurred when defendants had access to Bencom, and

14   confessions by defendant Lerma's co-defendants regarding their

15   involvement in Bencom's murder or the build-up to it. Additionally,

16   the jury heard testimony from CW-3 that, when he walked by Bencom's

17   cell after his free time was over, he saw Bencom lying still on the

18   cell's bottom bunk and did not hear from him afterwards. CW-6's

19   testimony was corroborated in nearly every aspect through other

20   witnesses and evidence. And while CW-1's testimony was largely

21   uncorroborated, he was not the sole witness to proving up an

22   essential element in this case; rather, he provided additional

23   evidence regarding the scope, hierarchy, and conduct of the

24   enterprise and its members.

25       Defendants cannot show this evidence would result in an

26   acquittal. At best, introduction of this impeachment evidence would

27   just result in a credibility battle that would have been resolved by

28

32

the jury; one the jury already took into consideration when examining all of the evidence presented at trial.

Notably, had this evidence been admitted, as discussed above, the jury would likely have been made aware that Mr. Navarro was a then-charged (now-convicted) child sex predator who cannot produce documentation he claimed to have had of his conversations with CW-6, and Mr. Macias is awaiting drug trafficking charges, with both likely seeking the good graces of a known and dangerous Mexican Mafia member who controls where they reside. And because the "new" evidence is immaterial impeachment evidence by non-credible witnesses, or is speculative to its connection to this case, it could not "probably" result in an acquittal. See United States v. Sanchez, 2018 WL 6171824, at *8 (D. Mont. Nov. 26, 2018) (determining that "potentially potent" impeachment evidence of a government witness was insufficient for a Rule 33 motion because the conviction did not hinge on the witness's credibility and it was uncertain if the jury would even believe the new impeachment evidence was authored by the witness meaning "there would be no argument a retrial would probably result in an acquittal.")

    4.   The Court's Rulings and Defendant Lerma's Inability to Secure Witnesses does not Warrant a New Trial.

Defendant Lerma's failure to secure witnesses and this Court's rulings excluding certain witnesses do not warrant a new trial. Neither of these reasons either "preponderates heavily against the verdict [such] that a serious miscarriage of justice may occur," or led to defendant being "unduly harmed or his trial made unfair by the erroneous admission or exclusion of evidence." A. Lanoy Alston, D.M.D., P.C., at 1211; Johnson, 337 F.3d at 203.

33

First, defendant Lerma's inability to timely secure witnesses in advance of trial does not warrant a new trial. Nowhere does defendant Lerma cite a case saying that a defendant's or sovereign's refusal to honor the terms of a federal writ render a trial unfair. That is because defendant Lerma had ample opportunities to explore additional remedies and failed to do so. For instance, defendant Lerma could have sought an order to show cause or order to comply with a federal writ against the Los Angeles Sheriff's Department. Defendant Lerma elected not to do so. Defendant Lerma could have petitioned the Court to declare Mr. Ruiz and Mr. Devault to be unavailable and move in their statements under Federal Rules of Evidence 804 or 807.[16] Defendant Lerma did not do so. Defendant Lerma could have acted on the writ long before trial and negotiated with the Sheriff, the Soledad State Prison Warden, or a Los Angeles District Attorney in advance to have witnesses available for trial or have them designated as a material witness. Defendant Lerma did not pursue this route. Instead, defendant Lerma relied on legal mechanisms and did not follow up on enforcing them. Defendant Lerma's failure to do this was not a fault of this Court and cannot serve as a reason for a new trial.

Second, the orders by this Court denying defendant Lerma's request to call Mr. Tolbert and Lt. Land as witnesses did not unfairly prejudice the matter, nor was it an erroneous decision by this Court. Both witnesses lacked probative value and were unduly prejudicial. In the case of Mr. Tolbert, he would have testified to statements allegedly made by Perez-Castaneda years after her arrest,

---

[16] The government would have opposed these requests.

34

and defendant Lerma's response after being informed of the statements. At the outset, anything said by Perez-Castaneda to Mr. Tolbert is inadmissible hearsay and has no probative value if admitted for any non-hearsay purpose. Likewise, any response by defendant Lerma to Mr. Tolbert would also be hearsay and would have no probative value if admitted for a non-hearsay purpose. See Fed. R. Evid. 402, 803. And the effect on a listener, namely defendant Lerma, by a random witness with no ties to defendant Lerma discussing a prior, uncorroborated statement by Perez-Castaneda has minimal probative value and would only serve to confuse the jury and waste time. Fed. R. Evid. 403. Additionally, defendant Lerma's reaction and subsequent statement only, minimally, provides context of the two's relationship at the time of the statement, not at the time of the charged offenses. Id. The Court properly ruled to exclude Mr. Tolbert.

Similarly and finally, the Court properly excluded defendant Lerma from recalling Lt. Land. Lt. Land's testimony would have been speculative and irrelevant based on the proffer presented by defendant. The Court properly ruled to exclude Lt. Land. Defendant was not prejudiced by either ruling, which would have only served minor impeachment purposes, if anything.

C.   **Defendant Sanchez's Joint Rule 33 Motion (Dkt. 1802).**

In his motion, defendant Sanchez ignores the wealth of testimony, surveillance video, and his own damning confessions, and instead re-raises several motions that were litigated pre- and mid-trial in order to ask for a new trial based on: (1) the Court's partial exclusion of defense's expert Roy Gravette and his testimony on BOP policies and inmate counts; and (2) additional cross

35

1    examination of CW-6 on spice usage that the jury already considered.

2    (Dkt. 1802, 1.) Each defendant joins in defendant Sanchez's motion.

3    (Id.) None of these arguments constitute a reason to grant a new

4    trial.

5                    1.    Defense Expert Roy Gravette Was Properly Excluded.

6          The defense hitched their wagon to Mr. Gravette to further an

7    inference, not a defense. For there to be any value in Mr. Gravette's

8    testimony regarding already admitted BOP policies on stand-up counts,

9    it required the necessary defense witness, CO Doralisa Alaniz, to be

10   credible and for the jury to believe she conducted an accurate stand-

11   up count in the first place. If shown, the defense would attempt to

12   infer that an accurate CO Alaniz stand-up count would show that

13   Bencom was last alive with CW-6 and claim CW-6 was his murderer. The

14   defense's strategy failed not from the exclusion of Mr. Gravette's

15   testimony on BOP policy (of which the jury was already aware through

16   the admitted defense exhibits) but instead because of CO Alaniz's

17   multifaceted credibility issues and lack of any independent

18   recollection to doing the stand-up count the day of the murder. To

19   the extent the defense claims Mr. Gravette would have "amplified

20   evidence" of CO Alaniz - that evidence was already before the jury

21   and further testimony by Mr. Gravette bleeds into impermissible

22   witness vouching.

23         Even so, the Court considered Mr. Gravette's testimony in detail

24   and excluded a part of his testimony as it related to the BOP

25   policies for valid reasons in the following exchange:

26                 Mr. Diamond:   Mr. Gravette is also offering
                   percipient testimony. But as to the expert
27                 testimony, they opened the door by going down this
                   road of whether people actually stand for counts
28

                                      36

1    and whether the guards require people to stand for
2    counts.

3    The Court:    Isn't Mr. Gravette the guy who used
     to work for Bureau of Prisons, but hasn't worked
4    for the last, how many years, 16 years or something
     like that?

5
     Mr. Diamond:   He hasn't worked for the Bureau of
6    Prisons –

7    The Court:    He never worked at MDC?

8    Mr. Diamond:   You kept him out on the assumption
     that the government was not going to impugn the
9    rules and regulations of the –

10   The Court:    I didn't say that. I said -- in
     other words, he's never worked at MDC and he has
11   left the Bureau of Prisons 16 years ago. He's not
     an expert.
12

13   (Dkt. 1718, 117:17-118:8.)

14        The above exchange demonstrates the permissible reasons to

15   exclude an expert who never worked at MDC where the crime occurred

16   and had retired in 2010. A court has broad discretion to exclude

17   expert testimony. United States v. Cristophe, 833 F.2d 1296, 1300

18   (9th Cir. 1987). To testify as an expert, a witness must not only be

19   qualified, but their testimony must be reliable or helpful to a jury.

20   See Fed. R. Evid. 702; Daubert v. Merrell Dow Pharmaceuticals, Inc.,

21   509 U.S. 579 (1993). The lack of MDC-specific knowledge warranted

22   exclusion. Mr. Gravette's generalized BOP testimony was neither

23   helpful nor reliable and it takes only a brief comparison to the

24   defense's other witness, former MDC Warden Heriberto Tellez, to

25   highlight what Mr. Gravette could not account for in his opinions.

26   Q: If we look at Paragraph 1, basic principle is
     that the institution will conduct, at a minimum,
27   five official counts in any 24-hour period. Was
     that the policy at the MDC Los Angeles when you
28   were there?

37

1    A: That's correct sir.

2    Q: And then if we drop down a little bit, it says
3    4:00 p.m. and 10:00 a.m. count and weekends and
    holidays, it will be stand-up. Was that the policy
4    at MDC Los Angeles when you were there?

5    A: I don't recall if it's 4, and 10, because of the
    mission at MDC Los Angeles. The time frames are
6    different than other institutions.

7    Q: Right, that is because it has a transient
    population that consists of both inmates and
8    detainees?

9    A: No, not at all. It has to do with – we're in the
10    city, and traffic, you have to account for traffic,
    and try to get our employees to work before they
11    had a traffic jam or anything like that. Where if
    you are at South Dakota, you can do a 4 o'clock
12    count, there is no traffic.

13    Q: Are you saying there wasn't a daily 4:00 p.m.
14    count?

15    A: I'm not sure if they had a 4 o'clock or they had
    a 3 o'clock, I'm not honestly sure.

16

17 (Dkt. 1719, 91:21-92:19.); see also Kumho Tire Co., Ltd. v.

18 Carmichael, 526 U.S. 137, 147-48 (1999) (holding that Daubert's

19 gatekeeping obligation requires both an inquiry into relevance and

20 reliability for all forms of expert testimony).

21   The above exchange also counters the defense's other point,

22 which is that Mr. Gravette would "enhance" the testimony of Warden

23 Tellez. (Dkt. 1802 at 1.) It fails to be seen how a generalist BOP

24 expert such as Mr. Gravette would assist the former MDC Warden's

25 testimony who describes an MDC implemented agenda rather than a BOP

26 program. Especially considering the following testimony from MDC

27 Warden Tellez who agreed with the government that "the count slips,

28 themselves, they aren't going to tell you a correctional officer

38

actually did their job or not" or even whether "the correctional
officers actually executed a stand up[.]" (Dkt. 1719 at 113:3-10.)
Yet the defense proffers Mr. Gravette as prepared to Monday-morning
quarterback a system he was not familiar with and to testify about
his irrelevant experience with BOP facilities unlike MDC, the best
practices of investigations from his non-MDC-trained perspective, and
on "foundational" count procedures perceived by MDC staff and culture
despite any actual familiarity with their protocols. Because Mr.
Gravette's testimony was not particularized to the actual issues in
the trial, this Court properly excluded him, and a new trial is not
warranted.

> 2. <u>The Defense was Afforded Proper Cross-Examination on CW-6's
> Use of the Spice that Defendant Jose Valencia Gonzalez
> provided him on the Evening After the Murder.</u>

Although he admits that "defendants were allowed to adduce
testimony of CW-6's spice use" and its "mind-altering effects and
capacity to induce paranoia" through multiple witnesses, defendant
Sanchez argues this was insufficient. (Dkt. 1802 at 24.) Due to this
Court's exclusion at trial of two specific additional incidents where
CW-6 fought with another inmate and another time when he was found
naked on his cell floor allegedly due to spice use, defendant Sanchez
seeks a new trial. (<u>Id.</u>, 22.) The reasoning in his brief is the same
theory he presented through cross examination, his defense expert,
and in closing arguments — CW-6's admitted spice use made him kill
the victim. The jury properly rejected this contrary argument because
surveillance video, percipient witnesses, and the defendants'
statements corroborated CW-6's account and proved the defendants
murdered the victim in MDC 6N before CW-6 had smoked spice.

39

There is no justification for a new trial. The circumstances here are not exceptional. The defense fails to articulate how these two prior instances would have been admissible, and even if they had been, "[i]mpeachment evidence does not warrant a new trial unless the testimony was 'uncorroborated and provided the only evidence of an essential element of the government's case.'" United States v. Marshall, 56 F.3d 1210, 1212 (9th Cir. 1995).

At their core, the instances of conduct the defense raises are vague, not violent instances, that do not support the defense's theory of a culpable drug-induced third-party suspect. In the first instance, custodial medical staff did not identify CW-6 as under the influence of spice and did not notate violent characteristics. (Dkt. 1810 at Ex. C.) In the second instance, medical staff did not identify CW-6 as under the influence of spice and never identified CW-6 as the aggressor or any evidence of injury. (Dkt. 1810 at Ex. D.) At trial, the defense could not adequately articulate the admissibility or benefit of these exhibits and cannot do so in his motion for a new trial. If anything, a stumbling and sleepy CW-6 is medically depicted as harmless and any prejudice the defense now alleges occurred at trial is seemingly put to rest.

The defendant finally focuses on the court "curtailing" his cross examination on CW-6's tattoo removal. (Dkt. 1802 at 23.) The jury heard evidence on cross examination of CW-6's tattoo on his face that said "Anybody Killa" and the "187" California Penal Code Section for murder tattooed on his index finger.[17] The Court allowed this testimony before the jury. Counsel for defendant Sanchez

---

[17] Referred to as a trigger finger despite no firearm being used in the murder of Bencom.

40

unsuccessfully sought to inquire as to CW-6's scheduled tattoo removal and drew a parallel to consciousness of guilt. Such a link, if believed, does not impact the government's case against each defendant. This evidence was properly excluded and a new trial is not warranted.

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendants' motions for a judgment of acquittal and a new trial.  (Dkts. 1799, 1800, 1802, 1803, 1804, 1805, 1807, 1808, 1809.)