FILED ON BEHALF OF ALL DEFENDANTS BY:
KENNETH M. MILLER (SBN 151874)
Ken@KMMillerLaw.com
26944 Camino de Estrella, Suite B
Capistrano Beach, California 92624
Phone: 949-388-3440

RICHARD G. NOVAK (SBN 149303)
Richard@RGNLaw.com
P. O. Box 5549
Berkeley, CA 94705
Phone: 626-578-1175

**Attorneys for Defendant
CARLOS GONZALEZ**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 18-00172-GW |
| Plaintiff, | **DEFENDANTS' POST-HEARING BRIEFING ON THEIR JOINT MOTION FOR A NEW TRIAL; FURTHER EXHIBITS IN SUPPORT THEREOF** |
| vs. | |
| MICHAEL LERMA, ET AL., | **[ADDITIONAL EXHIBITS CONCURRENTLY FILED UNDER SEAL]** |
| Defendants. | |

The defendants, by and through their respective counsel of record, hereby file their joint post-hearing briefing on their joint motion for a new trial.

Dated: March 5, 2026        Respectfully submitted
on behalf of all defendants,

/s/ Richard G. Novak
Richard G. Novak
Kenneth M. Miller
**ATTORNEYS FOR DEFENDANT
CARLOS GONZALEZ**

# POST-HEARING BRIEFING ON MOTION FOR A NEW TRIAL

## I.

### Procedural History

On September 22, 2025, the defendants timely filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 (hereinafter "the new trial motion").  (Doc. No. 1803 and associated joinders.)  The new trial motion was supported, in part, by two sworn affidavits by MDC-Los Angeles inmates who had communicated with Jose Martinez ("Slim") prior to and during the trial of this matter.  In those communications, Mr. Martinez admitted to them that he had personally killed the victim in this prosecution, Mr. Bencom, while they were locked in their cell together, exactly how he had done so, and that he intended to testify falsely that the individuals personally responsible for Mr. Bencom's death are the defendants in this prosecution.  Doc. No. 1803, Exhs. A & B)

Thereafter, the government filed an "omnibus" opposition to the new trial motion and other post-trial motions.  (Doc. No. 1821.)  The defendants filed replies on November 24, 2025 (Docs. 1832, 1833, and 1834.]  The hearing on the new trial motion was initially set for January 5, 2026. (Doc. No. 1814.)

On November 28, 2025, Mr. Gonzalez applied, on behalf of all defendants, for writs of *habeas corpus ad testificandum* for both Mr. Navarro and Mr. Macias. (Doc Nos. 1835, 1836.)  The government opposed the applications for these writs.  (Doc. No. 1839)  The Court approved the issuance of the writs for both Mr. Macias and Mr. Navarro.  (Doc. No. 1843)

On January 5, 2026, the Court ordered the defendants to file a supplemental memorandum setting forth information concerning when

and how they learned of the information in the affidavits of Messrs. Navarro and Macias. (Doc. No. 1872.) That memorandum was filed on January 18, 2026. (Doc. No. 1888.)

The evidentiary hearing on the new trial motion ultimately occurred on February 12 and 23, 2026. (Doc. Nos. 1908, 1918.) Mr. Navarro testified on February 12, 2026. Mr. Macias testified on February 23, 2026. Other witnesses testified and the court received into evidence certain exhibits. At the conclusion of the hearing on February 23, 2026, the Court left the record open so that additional exhibits could be lodged, and the Court ordered the parties to file their post-hearing briefing no later than March 5, 2026, at which point the motion would be under submission. (Doc. No. 1918) Sentencing for all four defendants is scheduled to occur on March 9, 2026.

## II.

## The Powerful Exculpatory Evidence Presented by Mr. Navarro and Mr. Macias Was Not Known to the Defendants, Nor to Their Counsel, Until Well After the Verdicts, and is "Newly Discovered" Within the Meaning of Rule 33

As explained in Doc. No. 1888, it was not until *May 2025* that counsel for the defendants learned that Mr. Navarro had engaged in the communications with Mr. Martinez that are set forth in his affidavit and about which he testified. The verdicts in this matter were returned on March 28, 2025.

On May 16, 2025, counsel for co-defendant Jose Valencia Gonzalez, Mr. Khojayan, informed other defense counsel that Mr. Valencia Gonzalez had just informed him that Mr. Navarro had very recently disclosed to him his communications with Mr. Martinez. After conferring with his counsel, undersigned counsel (Mr. Novak and Mr.

3

Miller) met with Mr. Navarro at MDC Los Angeles on May 28, 2025, to discuss the details of his communications with Mr. Martinez. Those details were ultimately set forth in Mr. Navarro's declaration which he signed on September 21, 2025. (Doc. No. 1888.)

Prior to receiving the general information shared by Mr. Khojayan on May 16, 2025, and speaking with Mr. Navarro 12 days later, counsel for the defendants had no information, notwithstanding their diligence in investigating this matter and preparing for trial, that Mr. Martinez had discussed his role in the death of Mr. Bencom with anyone at any time, other than with law enforcement officials. (Doc. No. 1888.)

Diligence is not an issue here. In the absence of any information that Mr. Martinez had spoken with other inmates about his role in the death of Mr. Bencom in June 2020, attempting to determine if, in fact, he had done so would require a fishing expedition far beyond what the law requires of a defendant. Mr. Martinez was detained in numerous correctional institutions, some outside of the district and out of state, between June 2020 and the beginning of the trial. It defies logic for the government to suggest, as it did in its omnibus opposition, that defense counsel should have gone looking for such witnesses. This the law does not require. The evidence presented by Mr. Navarro is clearly "newly discovered" within the meaning of Rule 33. [1]

---

[1] On March 5, 2026, Mr. Valencia Gonzalez filed a "Supplement" to the new trial motion (at Doc. No. 1950) which asks this Court to continue sentencing for all defendants and to keep the record on the new trial motion open in order to permit the defendants to lodge additional exhibits which are in the possession of the BOP and have not yet been produced to the defendants, if the Court has any lingering doubts that the evidence presented through Mr. Navarro and Mr. Macias, is, with respect to Mr. Valencia Gonzalez, "newly discovered" within the meaning of Rule 33. It is clearly "newly discovered" as to all of the other defendants, as set forth in Doc. No. 1888.

# III.

## Mr. Navarro's Declaration and Testimony Are Corroborated by the Housing Records Received Into Evidence

Without being privy to the confidential and sensitive BOP records which document which unit and cell each inmate is assigned to (the "IHQs"), Mr. Navarro's declaration accurately depicts where he was housed, where Mr. Martinez was housed, and where Mr. Macias and the other inmates on 8 North were housed in the relevant time period.[2]

Newly obtained IHQs lodged under seal (Exhs. F and G) further corroborate Mr. Navarro's testimony and his affidavit. Counsel for Mr. Lerma filed a Declaration on February 19, 2026 (Doc. 1912) detailing her attempts to locate witnesses whom Mr. Navarro stated were housed in the SHU on 8 North during the relevant time period: "Player", "G" and "Bad Boy". She determined that "Player" is Johnny Macias, "G" is Bayron Medina, and "Bad Boy" is Ernesto Echevarria. Exhibit C (Mr. Macias' IHQ), previously filed and admitted into evidence, verifies that Mr. Macias was in the SHU, C Range, with Mr. Navarro. The very recently produced IHQs (Exhibits F and G) verify that both Mr. Medina ("G") and Mr. Echevarria ("Bad Boy") were on C Range of the SHU with Mr. Navarro and Mr. Macias while the defendants were in trial in March 2025.

//

//

//

//

---

[2] The government did not provide counsel for the defendants with any of the relevant IHQs until well after Mr. Navarro's affidavit was executed and filed.

## IV.

## The Government Has Presented No Evidence Undermining the Affidavit and Testimony of Mr. Navarro

The government's effort to impeach Mr. Navarro was a failure. While Mr. Navarro was recently *convicted* of felony offenses in his own criminal proceeding, *judgment* has not been entered in that matter, and his motion for a new trial is pending before that Court.[3]  Judgment has not yet been entered in that case.  Therefore, the verdicts returned by the jury are not "final" and the verdict in Mr. Navarro's case is not admissible under Rule 609 to impeach his testimony.  *See, e.g. United States v. Allen*, 457 F.2d 1361, 1363 (9th Cir. 1972) ("It is the majority view and the law in this circuit that until the *judgment* of the lower court is reversed, the conviction will stand and the defendant may be questioned regarding that conviction for purposes of impeachment") (emphasis added).

At best, the government's efforts to impeach Mr. Navarro default to his alleged motive for assisting the defendants in this litigation; namely, the fact that he was charged with certain offenses which may subject to him to unfavorable treatment on a prison yard.  Mr. Navarro acknowledged that with those charges, he does need, generally, to be concerned about his safety, but there is no evidence that his affidavit and testimony will result in some efforts by the defendants to protect him, nor that those efforts would be successful.  In fact, even the government's own witnesses failed to present any testimony that Mr.

---

[3] On February 24, 2026, Mr. Navarro filed a motion for new trial.  That motion is presently set for hearing on March 13, 2026, but the government's recently-filed ex parte application to continue sentencing, which is also set for that date, states that it cannot respond to his new trial motion by the date set for sentencing.  (*U.S. v. Navarro, et al.* CDCA Case No. 2:22-cr-00340-AB, at Doc. Nos. 238, 244.)

Navarro's "status" among other inmates would be impacted by his testimony.

Additionally, the IHQ (Ex. D) of Mr. Navarro substantiates that he has been housed primarily in general population dating back to 2022 when he was first incarcerated. Government witness Amaro testified that in the IHQs, Z range refers to SHU (segregated housing unit) placement on the 8th floor. Mr. Navarro was in the SHU for a month in 2022 (9-2-22 thru 10-6-22); a couple of weeks in 2023 (2-9-23 thru 2-28-23) and 10 months in 2024-2025 (7-3-24 thru 4-24-25). Mr. Navarro has not isolated himself from others while in custody. He makes himself useful to other inmates by helping them with legal issues. He does not need the defendants' help to be safe in custody, contrary to the inferences argued by the government.

There is no evidence that he has a prior relationship with any of the defendants which would bias him in their favor, nor that he has a bias against Mr. Martinez. To the contrary, he testified that Mr. Martinez complemented him on his legal skills.

The government had two clear opportunities to attempt to impeach the affidavit and testimony of Mr. Navarro, both of which it elected not to pursue.

First, and most obviously, the government could have presented testimony from Mr. Martinez. Hypothetically, testimony from Mr. Martinez that would have been consistent with the government's *argument*, that Mr. Navarro's affidavit and testimony are false, would have permitted the court to weigh the credibility of the only two witnesses with personal knowledge about the content of their communications.

Mr. Martinez was on supervised release and in custody during the pendency of the new trial motion and was therefore available to testify if the government believed that his testimony would be helpful in its opposition to the motion.  It chose not to do so.  It didn't even lodge an affidavit from Mr. Martinez addressing Mr. Navarro's affidavit or testimony, nor did it evidence any effort to do so.  There are only two inferences to be taken from the government's decision not to rely upon Mr. Martinez in its opposition to the new trial motion.  Either it well knew that his testimony would not contradict that of Mr. Navarro, or it well knew that Mr. Martinez would invoke his rights under the Fifth Amendment and would have refused to testify on that basis.

Mr. Martinez was in federal custody from approximately December 24, 2025 to January 20, 2026. (Exhs. H and I.) The government had every opportunity to arrange for or, if necessary, compel his testimony.  Its decision not to do so is an inference that it would not have been helpful to their defense of the verdicts.[4]

The other glaring but surely strategically executed omission from the government's defense of the verdicts relates to BOP Correctional Officer ("C.O.") Malik Franklin, who, Mr. Navarro testified, took possession of the kites in his cell on Eight North, including those sent to him by Mr. Martinez.  Mr. Franklin is well known to the litigants in

---

[4] It is telling that the government has refused to disclose the records of Mr. Martinez' recent hospitalization and arrest. The defense requested them as they likely show extreme drug usage requiring drug detoxification and hospitalization, as well as his character for violence. The defense filed an Ex Parte Application for an Order directing the government to disclose these documents (Doc. 1903). This Court took the Ex Parte Application under submission and has not ruled on this request. This Court should grant that request, keep the record open until those records are produced and lodged by the defendants as exhibits in support of the new trial motion, and continue sentencing until the Court can rule upon the new trial motion with all relevant evidence before it.

this case, including government counsel, as he informed the FBI that he
participated in stand up counts in the unit where Mr. Bencom was
housed, and that in his opinion C.O. Alaniz "typically makes inmates
stand up for count." (Ex. H.) Mr. Navarro also testified that he had told
C.O. Franklin that the kites were evidence of a murder of an MDC
inmate.  The government's decision not to attempt to rebut this
testimony is a strong inference that Mr. Franklin's testimony would not
assist it in its opposition to the new trial motion.

**V.**

**Mr. Macias' Affidavit and Testimony Are Corroborated by BOP
Housing Records and Corroborates The Testimony of Mr.
Navarro**

Mr. Macias' sworn affidavit was filed in support of the new trial
motion.  (Doc. No. 1803, Ex. A.)  It was prepared by Ms. Derby after she
met with Mr. Macias on September 17, 2025 and it was signed by him
during a second meeting that she had with him on September 19, 2025.

While Mr. Macias invoked his right under the Fifth Amendment
to not answer some of Ms. Derby's questions during the hearing on
February 23, 2026, neither the context in which he invoked that right
nor the government's subsequent examination of him render his
affidavit a nullity.

Importantly, BOP records corroborate Mr. Macias' sworn affidavit
by establishing that he was housed on the same range as Mr. Navarro
and Mr. Martinez during the relevant time period, as outlined above.
Second, in order to attempt to impeach Mr. Macias (and/or for other
reasons), the government produced to the defendants prior to his
testimony BOP reports which establish that for a time well *before* trial,
Mr. Macias was housed with Mr. Lerma and that after he supposedly

9

flushed some narcotics he was holding on behalf of the Sureño
community at MDC, he debriefed and sought protective custody.

Arguably, Mr. Macias' declaration could be viewed as an effort to
restore his standing with the Sureño community, but the government
did not elicit that testimony from him or from any other witness.

Of course, his decision to invoke his Fifth Amendment rights at
the hearing and his repeated refusal to appear in court on a voluntary
basis strongly suggest that he did not want to be transported to court
with Sureño affiliated defendants who had recently learned that he had
debriefed to BOP intelligence officers and then be examined about that
in their presence.

His hesitancy to attend court and testify does not suggest that his
sworn affidavit is anything other than a truthful reporting of the events
and communications which transpired on Eight North among himself,
Mr. Martinez and others. Under the government's exaggerated
narrative of a *quid pro quo*, if Mr. Macias' affidavit were false and he is
simply concerned about his future status in the Sureño community,
refusing to testify would be counterproductive to that effort, especially
in light of his earlier decision to debrief.

Additionally, Mr. Macias testified that he wants nothing to do
with any STG (Security Threat Group), including the Mexican Mafia
and that he is happy and safe in the special housing units (initially the
7th floor and now the 9th floor).[5] (RT:16-17.) Mr. Macias was housed on
the 7th floor when he spoke with Ms. Derby in September 2025, and
agreed he was happy there and did not want to move (RT:17:3-13.)

---

[5] The transcript of Mr. Macias' testimony is attached hereto as Exhibit K. The
transcript of the testimony of Mr. Navarro is not yet available.

1  Clearly Mr. Macias wanted nothing from the Defendants or the
2  Mexican Mafia when he signed his declaration.

3       The far more reasonable inference is that Mr. Macias, after
4  consulting with his counsel, decided not to testify because there are
5  serious felony charges pending against him which he may wish to
6  resolve through compromise.  He is presently under indictment for
7  distribution of methampthamine, distribution of fentanyl, and related
8  firearms offenses.  (Ex. L.)

9       Although Mr. Macias invoked his Fifth Amendment rights
10 repeatedly, he did answer several questions that corroborate Mr.
11 Navarro's testimony and his own declaration. (Ex. A.) Mr. Macias
12 testified that he does know Mr. Navarro (RT:18:22-25) and that he was
13 in the SHU during March 2025 with Mr. Navarro, Slim, Bad Boy, and
14 G. (RT:19:18-19.)

15      Importantly, he testified that he never had any conversations with
16 any of the Defendants in February or March of 2025. (RT:30:17-19.)
17 This Court questioned Mr. Macias (RT:40:9-25):

18      THE COURT: Let me ask the witness a couple of
19      questions. You indicated that at some point in time you did
20      have a discussion with Ms. Derby, the attorney who is
21      questioning you just now?
22      THE WITNESS: Yes.
23      THE COURT: Had you ever met her before?
24      THE WITNESS: Met her before?
25      THE COURT: In other words, prior to this time that
26      you had a discussion with her?
27      THE WITNESS: No.
28      THE COURT: Prior to meeting with her, did you have

1      any idea as to what she wanted to talk to you about?

2      THE WITNESS: No.

3      THE COURT: So, you have, prior to meeting her, you

4      had no idea as to why she wanted to talk to you at that point,

5      did you?

6      THE WITNESS: No. I didn't even know who she was.

7           This Court's inquiry compellingly establishes that Mr. Macias was

8      not expecting, before meeting with Ms. Derby in September 2025, that

9      anyone would be inquiring about his communications in the SHU with

10     Mr. Martinez concerning the death of Mr. Bencom. Without advance

11     notice, Mr. Macias was questioned by Ms. Derby about whether he had

12     heard anything about "Slim" confessing to a murder and he related

13     information that is consistent with Mr. Navarro's declaration and

14     testimony. Finally, Mr. Macias acknowledged in his testimony that he

15     was told by Ms. Derby not to lie, and that she only wanted the truth.

16     (RT:31:14-19.)

17          As the Court noticed, the government made its own best effort to

18     elicit testimony from Mr. Macias and was partially able to do so until

19     the Court counseled the government not to do so.  The government

20     certainly could have moved the Court to strike Mr. Macias' affidavit

21     from the noticed motion, but it strategically chose not to do so and

22     instead did its best to work around his invocations in order to obtain

23     testimony from him.

24          In light of the government's strategic decision to seek further

25     evidence from him, which was partially successful, and to *not* move to

26     strike his affidavit, it remains part of the evidentiary showing in

27     support of the new trial motion.  He did not disavow its contents, and

28     the Court declined to inquire as to why he was invoking his Fifth

12

1  Amendment rights with respect to his affidavit.  The Court cannot and
2  should not draw an inference that the affidavit is anything other than
3  the truth, and the government failed to move this Court to strike it.[6]

4      Mr. Macias' affidavit is both consistent with that of Mr. Navarro
5  and corroborated by the BOP's own records.  The government presented
6  no evidence that would provide another explanation as to how Mr.
7  Macias' recitation of the events surrounding Mr. Martinez' confessions
8  to him and to Mr. Navarro are consistent with each other and with the
9  independent housing records.

## VI.

## Conclusion

12     The evidence presented in support of the new trial motion clearly
13  establishes that a new trial is required.  A new trial may be granted on
14  the basis of newly discovered evidence where the five following
15  requirements are met: (1) the evidence must be newly discovered; (2)
16  the failure to discover the evidence sooner must not be the result of a
17  lack of diligence on the defendant's part; (3) the evidence must be
18  material to the issues at trial; (4) the evidence must be neither
19  cumulative nor merely impeaching; and (5) the evidence must indicate
20  that a new trial would probably result in acquittal. *United States v.*
21  *Harrington*, 410 F.3d 598, 601 (9th Cir., 2005); *United States v.*
22  *Kulczyk*, 31 F.2d 542, 548 (9th Cir. 1991).

23     The Ninth Circuit has also explained that requirements factors
24  3,4 and 5 are duplicative.

---

[6] Of course, even if the government had moved to strike his declaration, this Court would have been compelled to deny that motion, as the government clearly had an opportunity to cross-examine him and obtain answers to many of its questions until it chose not to do so further upon the advice of the Court, and he also answered most of the Court's questions.  (Ex. J.)

13

1              Although we ordinarily state the test as

2              comprising five requirements, we have

3              recognized that requirements (3), (4), and (5) are

4              duplicative. That is, newly discovered evidence is

5              "material" when the result of the newly

6              discovered evidence is that "a new trial would

7              probably result in acquittal," a condition that is

8              not usually met when the newly discovered

9              evidence is "cumulative [ ]or merely

10             impeaching." *See, e.g., United States v.*

11             *Krasny*, 607 F.2d 840, 845 n.3 (9th Cir.

12             1979) (noting that the materiality and

13             probability requirements "are really two means

14             of measuring the same thing"); *United States v.*

15             *Davila*, 428 F.2d 465, 466 (9th Cir. 1970) (per

16             curiam) (noting that newly discovered

17             impeachment evidence supports a new trial if "it

18             is likely that the jury would have reached a

19             different result" in light of the evidence).

20             *United States v. Hinkson*, 585 F.3d 1247, 1284

21             (9th Cir. 2009).

22    There is no doubt at this point that the newly discovered evidence

23 produced in support of the new trial motion, including, *inter alia*, the

24 affidavits and testimony of Messrs. Navarro and Macias, the

25 documentary evidence that corroborates significant portions of their

26 affidavits concerning the housing location of the relevant witnesses,

27 juxtaposed with the government's failure to rebut the defendants'

28 persuasive showing with any testimony from Mr. Martinez who was

available to testify, is material to the issues at trial, is neither cumulative nor merely impeaching, and is sufficiently probative that an acquittal at trial would probably result.

Mr. Navarro will clearly testify at trial.  The various exhibits received into evidence in connection with the new trial motion are either admissible themselves or the information in them is admissible through a competent witness.  It very well may be that after a more searching assessment of Mr. Macias' invocation of his Fifth Amendment rights, as defense counsel requested on February 23, 2026 would result in a finding that he does not risk self-incrimination by testifying concerning the contents of his affidavit.  Moreover, the documentary evidence establishes that the other two inmates who Mr. Navarro testified were present on Eight North and involved in the passing of written communications were in fact housed in that location.  Their testimony at trial, based upon the documentary evidence, would at a minimum corroborate Mr. Navarro's testimony and may actually expand the scope of evidence demonstrating the innocence of the defendants.

Mr. Martinez' admission that he personally killed Mr. Bencom, in their shared cell, does not merely impeach his credibility.  It is direct evidence that the defendants are innocent of the charged homicide.  His confession, unknown to the defendants until after trial, is also consistent with other evidence that was presented by the defendants at trial concerning the time of Mr. Bencom's death and Mr. Bencom's participation in multiple "stand up" counts *after* the moment in time at which the government argued he was killed by the defendants.

"No one can doubt that a confession by another party to the crime for which petitioner has been tried and convicted, if discovered after

15

conviction, would be grounds for a new trial." *Casias v. United States*,
337 F.2d 354, 356 (10th Cir. 1964).

The Court should grant the new trial motion and schedule a new
trial on the implicated counts.

Dated:    March 5, 2026        Respectfully submitted
                              on behalf of all defendants,


                              /s/ Richard G. Novak
                              Richard G. Novak
                              Kenneth M. Miller
                              **ATTORNEYS FOR DEFENDANT
                              CARLOS GONZALEZ**

# Exhibit H

1

2

3

4

5

6

7



PILED
CLERK, U.S. DISTRICT COURT

**DEC** 2 4 2025

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

8

9

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

10

11 UNITED STATES OF AMERICA,

12

                         Plaintiff,

13

14            v.
JOSE MARTINEZ,

15

                      Defendant.

16

CASE NO. CR-18-00172-GW-9

ORDER OF DETENTION AFTER
HEARING (Fed.R.Cim.P. 32.1(a)(6)
18 U.S.C. § 3143(a) Allegations of
Violations of Probation/Supervised
Release Conditions)

17

18     On arrest warrant issued by the United States District Court for the
Central District of California involving alleged violations of conditions of

19

probation/supervised release:

20

    1. The court finds that no condition or combination of conditions will

21

        reasonably assure:

22

        A. ( √ ) the appearance of defendant as required; and/or

23

        B. ( √ ) the safety of any person or the community.

24

    2. The Court concludes:

25

        A. ( √ ) Defendant has failed to demonstrate by clear and convincing

26

            evidence that he is not likely to pose a risk to the safety of any

27

28

1    other persons or the community.  Defendant poses a risk to the

2    safety of other persons or the community based on:

3    _Pecent arrest for robbery while on_

4    _supervision_

5    _____

6    _____

7    _____

8    B. ( ✓ )   Defendant has failed to demonstrate by clear and convincing

9    evidence that he is not likely to flee if released.  Defendant poses

10   a flight risk based on: _no bail resources;_

11   _alleged absconding from supervision_

12   _____

13   _____

14   _____

15   _____

16   IT IS ORDERED that defendant be detained.

17

18

19

20   DATED: December 24, 2025

21   HONORABLE ALICIA G. ROSENBERG
     UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28

**ORDER OF DETENTION AFTER HEARING (18 U.S.C. §3142(i))**

CR-94 (06/07)                                                    Page 2 of 2

# Exhibit I

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 18-172-GW |
| Plaintiff, | **ORDER OF RELEASE** |
| v. | |
| 9. JOSE MARTINEZ, | |
| Defendant. | |

It is ORDERED that Jose Martinez (Register Number: 76585-112) shall be released forthwith. The U.S. Marshals and Bureau of Prisons shall take all necessary steps to ensure that the release occurs as soon as possible.

Dated: January 20, 2026

_____

HON. GEORGE H. WU
United States District Judge

1

# Exhibit J

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____09/01/2020_____

On August 7, 2020, Special Agent (SA) Robert Chowthi and SA Minh Tran interviewed MALIK FRANKLIN (FRANKLIN), a Corrections Officer (CO) at the Metropolitan Detention Center (MDC), 535 N Alameda St, Los Angeles, California, 90012, regarding the in-custody murder of ▉▉ ( ▉▉ alias RISKY), registration number ▉▉▉ . After being advised of the identity of the interviewing Agents and the nature of the interview, CO FRANKLIN provided the following information:

CO FRANKLIN has been working at MDC since September 1, 2019 and is still on probation. On Sunday, June 28, 2020, CO FRANKLIN was working the 2:00pm to 10:00pm shift. CO FRANKLIN has been working that shift for a couple of months, but worked on different floors and units. CO FRANKLIN thought that he may have helped with the 4:00pm stand up count on 6 North on June 28, 2020, but was not sure. CO DORALISA ALANIZ (ALANIZ) was the primary officer on duty at the unit that day, and CO FRANKLIN was working internal security, which consisted of picking up orderlies, delivering food carts and stuff to units, and other miscellaneous duties.

CO FRANKLIN was not on 6 North all day. He knew what ▉▉ and JOSE MARTINEZ (MARTINEZ) looked like, but didn't remember the specific count that was done that day, as the counts blend in with every day. When doing the counts, the staff are looking for flesh. They are supposed to see inmates stand up or have proof of life before moving onto the next cell. CO ALANIZ typically makes inmates stand up for count. CO FRANKLIN did not remember seeing ▉▉ stand up for count, and did not remember seeing him on Sunday. CO FRANKLIN did not know of any issues that ▉▉ may have had with other inmates. CO FRANKLIN noted that he had previously seen ▉▉ cellmate, MARTINEZ, under the influence. ▉▉ was pretty quiet. CO FRANKLIN has never noticed any issues with the GONZALEZ brothers (CARLOS GONZALEZ and JOSE VALENCIA-GONZALEZ), MIKE LERMA (LERMA), or LERMA's cellmate (JUAN SANCHEZ).

Investigation on  07/23/2020  at  Los Angeles, California, United States (In Person)

File # ▉▉▉▉▉▉▉                                    Date drafted  08/20/2020

by  CHOWTHI ROBERT, Minh D Tran

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

LS_001275

# Exhibit K



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,

                    Plaintiff,

          vs.                        Case No. CR 18-172-GW

MICHAEL LERMA, et al,

                    Defendants.
_____/

REPORTER'S TRANSCRIPT OF
MOTION FOR NEW TRIAL AND EVIDENTIARY HEARING
Monday, February 23, 2026
8:30 a.m.
LOS ANGELES, CALIFORNIA

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

1                        **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        UNITED STATES ATTORNEY'S OFFICE
         United States Attorney
5        BY:  KYLE W. KAHAN
             JASON A. GORN
6            KELLYE NG
             Assistant United States Attorneys
7        United States Courthouse
         312 North Spring Street
8        Los Angeles, California  90012

9

10   **FOR THE DEFENDANT:**  MICHAEL LERMA

11       LAW OFFICES OF MARRI DERBY
         BY:  MARRI B. DERBY
12            Attorney at Law
         23 Corporate Plaza Drive, Suite 150
13       Newport Beach, California  92660

14       LAW OFFICES OF JOEL MICAH FURMAN
         BY:  JOEL MICHAH FURMAN
15            Attorney at Law
         1432 Edinger Avenue, Suite 240
16       Tustin, California  92780

17

     **FOR THE DEFENDANT:**  CARLOS GONZALEZ
18

         LAW OFFICE OF KENNETH M. MILLER
19       BY:  KENNETH M. MILLER
              Attorney at Law
20       26944 Camino de Estrella, Suite B
         Capistrano Beach, California  92624
21

         RICHARD G. NOVAK APLC
22       BY:  RICHARD G. NOVAK
              Attorney at Law
23       65 North Raymond Avenue, Suite 320
         Pasadena, California  91103

24

25

                        **UNITED STATES DISTRICT COURT**

```
 1   APPEARANCES:  (Cont.)

 2
     FOR THE DEFENDANT:  JUAN SANCHEZ
 3
         O'MELVENY and MYERS LLP
 4       BY:  CHARLES PETER DIAMOND
              Attorney at Law
 5       1999 Avenue of the Stars, Suite 800
         Los Angeles, California  90067
 6

 7   FOR THE DEFENDANT:  JOSE VALENCIA GONZALEZ

 8       SHAUN KHOJAYAN and ASSOCIATES PLC
         BY:  SHAUN KHOJAYAN
 9            Attorney at Law
         515 South Flower Street, 19th Floor
10       Los Angeles, California  90071

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1                          **WITNESS INDEX**

2                              **\* \* \***

  **WITNESS:**                                      **Page**

3

  **JOHNNY MACIAS**

4

      Direct Examination by Ms. Derby          **9**

5

      Cross-Examination by Ms. Ng              **33**

6

      Redirect Examination by Ms. Derby        **37**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**EXHIBIT INDEX**

\* \* \*

**EXHIBIT NO.**                                                    **Page**

(No exhibits admitted.)

```
 1              LOS ANGELES, CALIFORNIA, MONDAY, FEBRUARY 23, 2026

 2                              10:00 a.m.

 3                                * * *

 4

 5         THE COURTROOM DEPUTY:  Please remain seated and come to

 6    order.  This United States District Court is again in session.

 7              THE COURT:  All right.  Let me call the matter of

 8    United States versus Lerma, et al.

 9         For the government, we have?

10         MR. KAHAN:  Good morning, Your Honor.

11         Kyle Kahan, Kelly Ng, and Jason Gorn for the United

12    States.

13         Also joining us at counsel table, is FBI Special Agent,

14    Joseph Talamentez.

15              THE COURT:  Good morning.  For the defendants, we

16    have?

17         MS. DERBY:  Good morning, Your Honor.  Mari Derby on

18    behalf of Mr. Lerman, who is present and in custody, and

19    co-counsel for Mr. Furman is in route.

20         MR. DIAMOND:  Good morning, Your Honor.  Charles

21    Diamond on behalf of Mr. Sanchez, who is present.

22              THE COURT:  Okay.

23         MR. MILLER:  Good morning, Ken Miller on behalf of

24    Carlos Gonzalez, who is also present, and also present is

25    Mr. Richard Novak.
```

```
 1              MR. HOAGY:  Good morning, Your Honor.  Shaun Hoagy
 2    for Jose Gonzales.  He is present, Your Honor.
 3              THE COURT:  And I guess at this point, we have
 4    Mr. Maci as well?  He is here?
 5         Should we do anything other than hearing from Mr. Macias
 6    first?
 7              MS. NG:  Yes, Your Honor.  Just one housekeeping
 8    matter before he gets on the stand.
 9              THE COURT:  Yes.
10              MS. NG:  We have previously spoken on with John
11    Aquilina, who is counsel for Mr. Macias.
12         He told us he that does not believe there is a conflict
13    in his representation of Mr. Macias.
14         As the Court may recall, Mr. Aquilina also represented
15    Daniel Diaz in this case, Defendant Number 12.
16         Again, Mr. Aquilina has said that he doesn't believe
17    there is a conflict.  We just wanted the Court to inquire with
18    Mr. Aquilina and Mr. Macias.
19              THE COURT:  He's here, let me inquire.  Is there a
20    conflict potentially?
21              MR. AQUILINA:  No, Your Honor.  Mr. Diaz's matter is
22    closed.  And I don't see any connection between Mr. Diaz and
23    these proceedings.
24              THE COURT:  Okay.  All right.
25         Let me ask defense counsel, have any defense counsel
```

**UNITED STATES DISTRICT COURT**

```
 1    have any questions about this issue?
 2              MS. DERBY:  No, Your Honor.
 3              THE COURT:  No one?
 4         Let me ask, do you wish to stand next to your client
 5    when he is being questioned?
 6              MR. AQUILINA:  If I may please, Your Honor.
 7              THE COURT:  Sure.  All right.
 8         Let me have the marshals bring out Mr. Macias.
 9              MS. DERBY:  Your Honor, can I please have
10    Mr. Lerma's left handcuffed so he can write?
11              THE COURT:  Let me ask the marshals, any problem
12    with that?
13              THE MARSHAL:  No, Your Honor.
14              MR. DIAMOND:  I would make the same request for
15    Mr. Sanchez, Your Honor.
16              MR. MILLER:  We would as well.
17              THE COURT:  All right.  I will grant that request if
18    the marshal doesn't have any issue?
19         Okay.  All right.  Javier, can you let them walk through
20    the well?
21              THE COURTROOM DEPUTY:  Yes, sir.
22              THE COURT:  You can walk through the well.
23              MR. AQUILINA:  May I?
24              THE COURT:  Yes.
25              THE COURTROOM DEPUTY:  Sir, before you sit, please
```

```
 1    raise your right hand.
 2            Do you solemnly swear that the testimony you shall give
 3    in the cause now before the Court, shall be the truth, the
 4    whole truth and nothing but the truth, so help you God?
 5                  THE WITNESS:  Yes, sir.
 6                  THE COURT:  Thank you.
 7                  THE COURTROOM DEPUTY:  Please state your name and
 8    spell your last name for the record.
 9                  THE WITNESS:  Johnny Macias.
10            You said state -- spell the last name?
11                  THE COURTROOM DEPUTY:  Spell the last name.
12                  THE WITNESS:  M-a-c-i-a-s.
13                  THE COURT:  All right.
14                            DIRECT EXAMINATION
15    BY MS. DERBY:
16    Q    Good morning, Mr. Macias.  Thank you for being here.
17            It seemed you did not want to be here; is that right?
18    A    Correct.
19    Q    Have you reviewed the declaration you signed -- you signed
20    with me on September 19th of 2025?
21    A    Yes.
22    Q    Okay.  Did you state anything false in that declaration?
23    A    I assert the Fifth Amendment.
24    Q    Are you planning on testifying today that you lied in that
25    declaration?
```

```
 1  A     I assert the Fifth Amendment.
 2             MS. DERBY:  Your Honor, I think we need to address
 3  whether the Fifth Amendment applies in this situation.
 4             THE COURT:  Let me hear a response from the
 5  government.
 6             MS. NG:  Your Honor, the standard is not whether the
 7  government is likely to bring charges against the defendant or
 8  a witness, but whether the government can.
 9        So if the answer to that question could possibly give
10  rise to charges, then the witness could invoke the Fifth
11  Amendment.
12             THE COURT:  All right.  Let me hear from the
13  witness's counsel.
14        What is your position?
15             MR. AQUILINA:  Your Honor, I would agree with
16  government counsel.  I would only add the word "potential."
17             THE COURT:  Okay.  Let me hear from defense counsel
18  for Lerma, what is your response to that?
19             MS. DERBY:  The response is, Your Honor, that under
20  United States versus Whittington, the Fifth Amendment does not
21  apply, and Whittington is 783 F.2nd 1210.
22             THE COURT:  783 F.2nd, what?
23             MS. DERBY:  1210.
24             THE COURT:  Okay.
25             MS. DERBY:  In Whittington, even if the witness's
```

UNITED STATES DISTRICT COURT

1 testimony was false, a witness cannot claim the Fifth Amendment

2 out of fear that they will be prosecuted for perjury about for

3 what he's about to say.

4       The shield against self-incrimination in such a

5 situation is to testify truthfully, not to refuse to testify on

6 the basis that the witness may be prosecuted for a lie not yet

7 told.

8       So, this is also -- boy, I need some water -- also

9 *Cronic versus United States*, 343 F.2nd, 436.

10       The right to refuse to answer --

11       THE COURT:  Sorry, 343 F.2nd or F.Supp?

12       MS. DERBY:  F.2nd.  It's a Ninth Circuit from 1965.

13       The right to refuse to answer relates only to past

14 conduct, and is wholly inapplicable to future acts, which may

15 or may not be committed, and which may or may not constitute

16 law violations.

17       So, he has to testify.  He has to answer the questions.

18       THE COURT:  Let me ask, don't you ask him whether or

19 not he basically lied in his declaration.

20       Is that what you are asking him, about whether or not he

21 has committed a crime that has already been committed?

22       MS. DERBY:  Just look at the cases.  You cannot take

23 the Fifth in those situations.

24       THE COURT:  Let me hear a response from the

25 government.  What is the government's response?

1         MS. NG:  Your Honor, with respect to the first case

2    that counsel just brought up for the first time, *United States*

3    *versus Whittington*, we would note that that is a Fifth Circuit

4    case that is not binding to this Court.

5         We would also point the Court to the government's brief

6    that it filed on February 11th, at Docket 1907, and that's

7    *United States versus Cowser*, 2021, Westlaw, 5493411.

8         It's a Ninth Circuit decision granted.  It is

9    unpublished.

10        But it noted, in that case, that the District Court did

11   properly allow the witness to invoke, and that included prior

12   sworn statements, possibly subjecting a witness to a perjury

13   prosecution.

14        MS. DERBY:  I would state, Your Honor, that there is

15   even additional Ninth Circuit case law on this exact point.

16        Twelve years after the Ninth Circuit's case, *Cronic*, in

17   *United States versus Colin*, 623 F.3d 1065, it reversed a

18   District Court, that spared a witness from testifying out of

19   concern that his testimony would be viewed as perjurious.

20        It explained, while the Fifth Amendment --

21        THE COURT:  That is not your question.  Your

22   question asked whether or not he perjured himself in his

23   declaration.

24        MS. DERBY:  And he's taking the Fifth.

25        THE COURT:  Because otherwise, you expect if the

**UNITED STATES DISTRICT COURT**

```
 1   answer is yes, I perjured myself, he can take his Fifth.
 2            MS. DERBY:  No.
 3            THE COURT:  Why not?
 4            MS. DERBY:  No.  Because the case law is contrary.
 5            THE COURT:  You are asking whether or not he
 6   perjured himself.
 7            MS. DERBY:  I don't know if he did or not.  We know
 8   know -- we know he's taking the Fifth.
 9            THE COURT:  No.  You are asking a question that if
10   he answers in it a particular way, will subject himself to
11   prosecution for perjury.
12         Let's put it this way, I'm allowing you to ask another
13   question, insofar as the question you have just asked him, you
14   are asking him whether or not he perjured himself.
15            MS. DERBY:  Okay.  I will.
16         But let me finish with this last legal argument, Your
17   Honor, because I think the Court needs to understand this
18   situation.
19         In *Erp*, it explained while the Fifth Amendment protects
20   witnesses from incriminating themselves on the basis of past
21   conduct, it provides no protection for the commission of
22   perjury.
23         This is a Fifth Amendment case, citing *United States*
24   *versus Applebaum*, which is United States Supreme Court.
25            THE COURT:  You are saying that all witnesses have
```

1   to admit that they perjured themselves?

2          MS. DERBY:  No.  What I'm saying is that there is no

3   doctrine of anticipatory perjury.

4          THE COURT:  You are not asking about anticipatory

5   perjury, you are asking him about already committed perjury.

6   You are asking him whether or not the statements of the

7   declaration are false.

8          If the statements in the declaration are false, he's

9   already committed perjury, not future perjury, past perjury.

10          MS. DERBY:  I would say, Your Honor, that -- well,

11   let me ask him a few more questions.  Let's go this way.

12          THE COURT:  All right.

13   BY MS. DERBY:

14   Q    Beginning from August 12, 2025, you were moved to a

15   different floor, basically the 7th floor, which is now the 9th

16   floor at Metropolitan Detention Center, correct?

17   A    Yes.

18   Q    And that floor is -- you had to get approval to move to

19   that floor, correct?

20          MR. AQUILINA:  Your Honor, I would interpose an

21   objection as speculative.

22          THE COURT:  Rephrase the question, or lay a

23   foundation for his response.

24   BY MS. DERBY:

25   Q    Okay.  That floor is where -- it's not a general

```
 1    population floor; is that right?
 2              MS. NG:  Objection.  Calls for speculation.
 3              THE COURT:  I will allow the witness to answer that
 4    question, if he understands the question, and if he has a basis
 5    for answering the question.  He's basically asking for his
 6    knowledge.
 7              THE WITNESS:  No.  I don't know.
 8    BY MS. DERBY:
 9    Q    You don't know?
10              MR. AQUILINA:  Can I have one moment?
11              THE COURT:  Sure.
12              MR. AQUILINA:  If the question would be repeated,
13    please?
14              MS. DERBY:  Yes.
15    BY MS. DERBY:
16    Q    Is the 7th floor, and now the 9th floor, is that a regular
17    general population floor at MDC?
18    A    I don't know, to be honest.
19    Q    Where are you housed currently, are you in general
20    population?
21    A    I'm not sure how they label that floor, ma'am.
22    Q    You have been on a 6th floor and the 5th floor before,
23    correct?
24    A    Yes.
25    Q    Okay.  The floor you are now on is not the same as those
```

**UNITED STATES DISTRICT COURT**

16

```
 1   floors, correct?
 2   A    Once again, I don't know how they label that floor, ma'am.
 3   Q    You may not know how they label it, but -- well, let me
 4   ask you, do you feel save on those floors?
 5   A    To me, it's a regular unit.
 6   Q    To you, it's a regular unit.
 7        Would you be happy to go back to the 6th floor right
 8   now?
 9   A    I don't think that would be a good idea.
10   Q    Right, because it's a general population floor, correct?
11   A    Yeah.  If that's what you want to call it.
12   Q    But right now, you are happy and feel safe when you are on
13   the 7th floor and now on the 9th floor, right?
14   A    Yes.
15   Q    Okay.  Do you have -- let's just go back to
16   September 19th, when you signed that declaration, did you want
17   to go back to the 6th floor or the 5th floor?
18   A    No.
19   Q    Okay.  Now, you want out from all STGs, correct?
20   A    Yes.
21   Q    An STG, what is that?
22   A    Security Threat Group.
23   Q    So you want to not be involved with any sort of gang in or
24   out of custody; is that right?
25   A    Yes.
```

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | Q    That's including the Mexican Mafia, correct? |
| 2 | A    Yes. |
| 3 | Q    Now, you met with me at MDC visiting on two separate |
| 4 | occasions, right? |
| 5 | A    Yes. |
| 6 | Q    Okay.  On September 17th, and on September 19th, correct? |
| 7 | A    I don't recall the dates, ma'am. |
| 8 | Q    Okay.  And when you met with me on those dates, you were |
| 9 | already on the 7th floor; isn't that right? |
| 10 | A    Yes. |
| 11 | Q    Okay.  And you were happy there, you did not want to move, |
| 12 | correct? |
| 13 | A    Yes. |
| 14 | Q    Now, for a month, from February 28th, 2024, to March 28th, |
| 15 | 2024, you were Mr. Lerma's cellmate; is that right? |
| 16 | A    Yes. |
| 17 | Q    What was your opinion of Mr. Lerma? |
| 18 |        MR. AQUILINA:  Your Honor, I would impose an |
| 19 | objection.  Vague. |
| 20 |        THE COURT:  Rephrase. |
| 21 | BY MS. DERBY: |
| 22 | Q    Well, you thought Mr. Lerma was nice, right? |
| 23 | A    Yeah. |
| 24 | Q    All right.  Is he so nice you would want to lie for him? |
| 25 | A    I assert the Fifth, ma'am. |

**UNITED STATES DISTRICT COURT**

```
 1              MS. DERBY:  I would like the record to reflect with
 2   every question, he is conferring with counsel.
 3              THE COURT:  That's why normally people have counsel,
 4   they can confer with them.
 5   BY MS. DERBY:
 6   Q    So are you saying you lied for Mr. Lerma because he's so
 7   nice?
 8   A    I assert the Fifth, ma'am.
 9   Q    Did you -- are you saying you lied for Mr. Lerma?
10   A    I assert the Fifth, ma'am.
11   Q    In February of 2025 through March of 2025, you were in the
12   Segregated Housing Unit in cell 827; is that correct?
13              THE COURT:  Let me ask the reporter, while he's
14   conferring with his counsel, can you read back?
15                        (Record read.)
16              THE COURT:  Thank you.
17              THE WITNESS:  I assert the Fifth, ma'am.
18   BY MS. DERBY:
19   Q    All right.  And then from March 29th to April 7th, you
20   were in cell 826 in the SHU, Segregated Housing Unit, correct?
21   A    I assert the Fifth.
22   Q    Do you know an inmate by the name of Navarro?
23   A    Yes.
24   Q    Okay.  And Daniel Navarro; is that right?
25   A    Yes.
```

**UNITED STATES DISTRICT COURT**

1   Q    And you were in the SHU with him in February and March; is

2   that right?

3   A    I assert the Fifth.

4   Q    Where was his cell in comparison to your cell when you

5   were in the Segregated Housing Unit?

6   A    I don't recall, ma'am.

7   Q    When you were in the Segregated Housing Unit in March and

8   April of 2025, did you know someone named Slim or who went by

9   the name of Slim?

10  A    Yes.

11  Q    What about someone by the name of Bad Boy?

12  A    Yes.

13  Q    And what about someone by -- who went by the name G?

14          THE COURT:  Sorry, the letter G?

15          MS. DERBY:  Yes.

16          THE WITNESS:  Yes.

17  BY MS. DERBY:

18  Q    Okay.  So you were all in the SHU together at the same

19  time in February and March of 2025, correct?

20  A    Yes.

21  Q    Now, when you were in the SHU, do you remember hearing

22  Slim make statements?

23  A    I assert the Fifth, ma'am.

24  Q    Do you remember seeing Slim fish kites?

25  A    I assert the Fifth.

**UNITED STATES DISTRICT COURT**

1    Q    Are you asserting the Fifth because you are afraid that

2    the government is going to somehow hurt you in your pending

3    case for testifying here today?

4         MS. NG:  Objection.  Argumentative.

5         THE COURT:  I will allow the question if the witness

6    understands the question, but he can talk with his counsel

7    about it.

8         THE WITNESS:  I assert the Fifth, ma'am.

9    BY MS. DERBY:

10   Q    You told me you were afraid the prosecution was going to

11   hurt you if you testified, correct?

12   A    I assert the Fifth.

13   Q    Do you know anything about the Green Light Gang?

14   A    I assert the Fifth, ma'am.

15   Q    Were you ever recruited or asked to join the Green Light

16   Gang by Slim?

17   A    I assert the Fifth.

18   Q    Did you ever hear Slim brag about killing his cellie by

19   stabbing him in the eye and heart?

20   A    I assert the Fifth, ma'am.

21   Q    Do you remember hearing Slim say that Mr. Lerma and the

22   other co-defendants looked like cops in their suits.

23        Do you remember overhearing Slim say that?

24   A    I assert the Fifth, ma'am.

25        MS. DERBY:  Your Honor, I think it's time to address

**UNITED STATES DISTRICT COURT**

```
 1    the legality and ability for him to assert the Fifth on these

 2    questions.

 3              THE COURT:  All right.  What do you want to say to

 4    me?

 5              MS. DERBY:  How does any of this put him in

 6    jeopardy?

 7              THE COURT:  I will hear a response from the

 8    government.

 9              MS. NG:  Your Honor, given the questions that are

10    posed to the witness, if, for example, the witness lied under

11    oath, but what is in the declaration, then that could subject

12    him to a perjury prosecution.

13              MS. DERBY:  Then I think we need to uncover, if that

14    is the reason, then maybe he can assert the Fifth, which I

15    don't believe he can, but we don't know what the reason is

16    because this witness has expressed that he is in fear that he

17    is going to be harmed in his pending case for testifying.

18              MS. NG:  Your Honor --

19              MS. DERBY:  So we need to understand why he's

20    asserting the Fifth.

21         If he is asserting the Fifth because he made up that

22    declaration, then maybe he has the right, maybe.

23         But we don't know, and you can take it in camera, you

24    can address it, but we need to understand why he's taking the

25    Fifth, because we certainly can't -- we don't know at this
```

UNITED STATES DISTRICT COURT

1    point.

2         He is saying -- he is taking the Fifth on whether --

3    he's never even heard of the Green Light Gang, how can he

4    possibly be incriminated for knowing -- having any information

5    about that?

6              MS. NG:  Your Honor, to clarify for the record,

7    Mr. Beecher stated that the witness testified to the certain

8    item, that did not come into testimony, so we reject that.

9         As to the other points that counsel just raised, if the

10   answer is -- that was not true, what I put in my declaration,

11   for example, when he talks about the Green Light Gang, again,

12   that could possibly open him up to a perjury prosecution.

13             THE COURT:  Let me hear from the witness's counsel.

14   What is your position?

15             MR. AQUILINA:  Your Honor, my position, first of

16   all, I'm not totally familiar with the cases counsel has cited.

17   The first I have heard of them was this morning.

18        Regardless, I think the Court must make a determination

19   of whether the witness has a Fifth Amendment privilege or not,

20   whether an assertion can be made or not, and based upon, I

21   believe, the representations of counsel, Mr. Macias has

22   answered in the fashion he has.

23        I know of no authority that the witness must explain why

24   he's asserting the Fifth Amendment privilege.

25        If there is authority to that, I will stand corrected,

1    but basically, let's just use a hypothetical that has been

2    mentioned here, if the concern of the witness is that he

3    falsely made a sworn declaration and the question is, well, why

4    are you asserting the Fifth to that question, then the witness

5    has to incriminate himself to explain why he's making that

6    assertion.

7         These assertions are, again, I think, based on good

8    faith and based upon the representation of counsel.

9         THE COURT:  Let me ask the -- well, just a moment.

10        Let me indicate the case that the defense has cited

11   *Cronic Versus United States*, which is 343 F.2d 436, that case

12   stated -- let me see if I can find it -- that the privilege

13   against self-incrimination guaranteed by the Fifth Amendment

14   extends not only to answers which would in themselves support a

15   conviction under a federal criminal statute, but also embraces

16   a language in the chain of evidence needed to prosecute the

17   defendant to a federal crime, that is citing to 341 U.S. 159,

18   161, which is obviously a Supreme Court case.

19        In that case, the Circuit said that the defendant was

20   under no -- the defendant had no reasonable cause to apprehend

21   danger because of a possible perjury charge based on assertedly

22   false testimony given in the criminal action, because there,

23   the District Court held Section 15 U.S.C. Section 32 -- sorry,

24   15 U.S.C. Section 32, afforded him from complete immunity from

25   prosecution from any perjury he may have committed at the

1  criminal trial.

2          So, that is not what we have here.  I mean, he has no

3  immunity.  He's not been afforded any immunity as to this

4  particular testimony here.

5          MS. DERBY:  Your Honor, all I can say is that a

6  witness may not claim the privilege of the Fifth Amendment out

7  of fear that he will be prosecuted for perjury for what he is

8  about to say.

9          The shield against self-incrimination situation is to

10 test, quite truthfully, not to refuse to testify on the basis

11 that the witness may be prosecuted for a lie, not yet told.

12         And that is on 12 -- page 1218 of *Whittington*.

13         I'm very -- I don't understand how -- I think the Court

14 should inquire, and can inquire in camera as to the basis,

15 because in my conversations with this witness, I don't believe

16 it's because he lied, I believe it's because he's afraid of

17 what is going to happen to him.

18         THE COURT:  Well, the problem is that as his counsel

19 has indicated, you can't inquire as to the -- whether or not he

20 fears prosecution in his other pending criminal case or whether

21 or not he's indicating that he had perjured himself in the

22 declaration that he submitted here.

23         MS. DERBY:  There is no way any of his testimony is

24 going to link to his pending criminal case.

25         The only --

1          THE COURT:  The problem is, if he perjured himself

2    in some way, shape, or form in his declaration, then he is

3    subjecting himself to risk of a perjury charge being made

4    against him, because he swore to tell an oath, and if he

5    violated that oath, it's perjury.

6          MS. DERBY:  But we don't know that.  We don't know.

7          THE COURT:  That is, kind of, like, the problem.

8          MS. DERBY:  I think the Court should inquire in

9    camera.

10          THE COURT:  What am I going to inquire about?

11          MS. DERBY:  Can you ask him, look, are you afraid of

12   saying what you said in the declaration, because it was false

13   or are you a taking the Fifth for another reason.

14          THE COURT:  I don't -- let me ask defense counsel,

15   if I were to even ask him that question, I presume you would

16   object.

17          MR. AQUILINA:  That's correct, Your Honor.

18       Two things:  One is, again, I haven't read the

19   *Whittington* case, but from what I'm hearing, *Whittington* stands

20   for the proposition that you can't assert a Fifth Amendment

21   privilege because tomorrow I'm going to commit perjury.

22       That is not why or the basis of an assertion in this

23   Court.

24       The second thing is even if the Court conducts an in

25   camera hearing, why are you asserting the Fifth Amendment?

**UNITED STATES DISTRICT COURT**

1    He's still going to assert the Fifth Amendment for the same

2    questions.

3            MS. DERBY:  You can't hide behind the Fifth

4    Amendment, because you don't want to be here, you don't want to

5    be involved, you are afraid the prosecutors are going to be

6    mean to you on your pending case, all of those are invalid

7    reasons.

8            So, and I don't think we have any evidence if there is a

9    valid Fifth Amendment claim here.

10           THE COURT:  The question is whether or not there is

11   sufficient basis -- basically, what I just quoted you from the

12   case you cited to me, which is the -- what you call the case,

13   the *Cronic* case, I have just quoted you from what it says.

14           But in the *Cronic* case the reason why there was

15   inability to raise the Fifth was because that witness was under

16   immunity, so no matter what he said, he's not going to be

17   subject to prosecution.

18           There is no immunity granted as to this particular

19   witness, so that contention is not within the defenses.

20           MS. DERBY:  Obviously, I can't grant him immunity,

21   I'm sure the prosecutor doesn't want to hear what he has to

22   say, so they are not going to grant him immunity either.

23           THE COURT:  It is what it is, as they say.

24           What else do you want to ask him?

25           MS. DERBY:  Let me ask a few more questions.

**UNITED STATES DISTRICT COURT**

1              THE COURT:  Sure.

2    BY MS. DERBY:

3    Q    Mr. Macias, you said you know Daniel Navarro or you met

4    him before, correct?

5    A    Yes.

6    Q    All right, and you had some conversations with him,

7    correct?

8    A    Yes.

9    Q    And how would you describe Mr. Navarro?

10              MR. AQUILINA:  I will interpose an objection based

11    on vagueness.

12              THE COURT:  Rephrase.

13    BY MS. DERBY:

14    Q    How would you describe his character, if you have an

15    opinion about his character, how would you describe his

16    character?

17    A    I have no opinion, ma'am.

18    Q    Well, isn't it true you said he was really nice and a

19    legal beagle?

20    A    I assert the Fifth, ma'am.

21              MS. DERBY:  Your Honor, how can that possibly

22    incriminate himself?

23              THE COURT:  Why are you asking me questions?

24              MS. DERBY:  Okay.  Let's go with -- Mr. Navarro

25    would help people, or you observed Mr. Navarro help people on

```
 1    their cases; isn't that true?

 2              THE WITNESS:  I assert the Fifth, ma'am.

 3              MS. DERBY:  Your Honor, at this time, again, I don't

 4    believe there is a basis for asserting the Fifth, and the Court

 5    is supposed to analyze it on a question-by-question basis, and

 6    how could that possibly incriminate him?

 7              THE COURT:  Let me hear a response from the

 8    witness's counsel.  What is your response?

 9              MR. AQUILINA:  Your Honor, if the statement is

10    contrary to a prior statement, it can possibly incriminate

11    Mr. Macias.

12          And just for the record, I was not present when

13    Ms. Derby interviewed Mr. Macias, so I don't know exactly what

14    was said from my personal perspective.

15              THE COURT:  Let me ask Ms. Derby a question, did you

16    know the witness was under a different some sort of criminal --

17    well, obviously, he was in detention, so you did know he was

18    involved in -- he was a defendant in another criminal case.

19              MS. DERBY:  Correct.

20              THE COURT:  At the time you interviewed him?

21              MS. DERBY:  Correct.

22              THE COURT:  Why didn't you contact his counsel?

23              MS. DERBY:  I did.  And there was some

24    miscommunications.  We were going to meet and then I happened

25    to be at MDC, and I called him down.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  All right.  That answers that question
 2   then.
 3              What else do you want to ask this witness?
 4   BY MS. DERBY:
 5   Q    What would you describe Slim's character, his personality,
 6   how would you describe that?
 7   A    I have no opinion, ma'am.
 8   Q    Well, you did before, correct?
 9   A    I assert the Fifth.
10   Q    Slim was a big talker, correct, you heard him talk a lot?
11   A    I assert the Fifth, ma'am.
12              MS. DERBY:  Your Honor, I say on a
13   question-by-question basis, how can that possibly be a Fifth
14   Amendment privilege?
15              THE COURT:  Well, let me ask counsel for the
16   witness, what is your response to that?
17              MR. AQUILINA:  My response to that is that the next
18   question is what did you hear him say.
19              THE COURT:  Well, in addition to that, I think you
20   are taking the position that he already made a statement under
21   oath as to that question, so if he were to say something
22   different than what he were to say here now, then it would be a
23   basis for further inquiry as to whether or not he lied under
24   oath originally or lied under oath now or whatever.
25              I think that's what the witness's counsel has been
```

UNITED STATES DISTRICT COURT

30

```
1   stating previously.

2       (Witness and defense counsel conferring, off the record.)

3           MS. DERBY:  Am I allowed to question?

4           THE COURT:  Let me just ask the counsel for the

5   witness, you are finished talking with your client?

6           MR. AQUILINA:  Yes, I'm sorry.

7           THE COURT:  Okay.  You can ask another question.

8   BY MS. DERBY:

9   Q    Have you ever seen Slim obtain drugs while he was in the

10  SHU?

11  A    I assert the Fifth, ma'am.

12  Q    Did you ever have a conversation with any of these four

13  defendants, Mr. Lerma, Mr. Jose Valencia Gonzalez, Mr. Juan

14  Sanchez, or Carlos Gonzalez, did you have a conversation with

15  them about making up a story about Slim?

16  A    I assert the Fifth, ma'am.

17  Q    In February and March of 2025, did you ever have any

18  conversations with any of these four defendants?

19  A    No.

20  Q    When you were in the SHU, did you ever see anyone pass

21  kites?

22  A    I assert the Fifth, ma'am.

23  Q    Well, in your -- when your case is finished, would you be

24  able to testify at that time?

25          MR. AQUILINA:  Your Honor, I would interpose a
```

```
 1  speculative objection.
 2          THE COURT:  Rephrase, if you can.
 3  BY MS. DERBY:
 4  Q    When your case -- you have a pending case, correct?
 5  A    Yes.
 6  Q    And ultimately that case will resolve one way or the
 7  other, trial, or you will plead guilty, correct?
 8  A    Yes.
 9  Q    And once that result -- final result occurs, would you be
10  willing to testify about your declaration without claiming the
11  Fifth Amendment?
12          MR. AQUILINA:  Objection.  Speculation.
13          THE COURT:  I will sustain the objection.
14  BY MS. DERBY:
15  Q    When you and I spoke, I told you I didn't want you to lie,
16  right?
17  A    Yes.
18  Q    And I told you that I only wanted the truth, correct?
19  A    Yes.
20  Q    And sometime later, I went to see you and you refused to
21  come see me, correct?
22          MR. AQUILINA:  Objection.  Speculation.
23          THE COURT:  Let me ask the witness, do you
24  understand her question?
25          MR. AQUILINA:  Your Honor, the basis of my objection
```

**UNITED STATES DISTRICT COURT**

1    is Mr. Macias may or may not know what to say.

2         THE COURT:  That's why I asked him, does he

3    understand the question.

4         MR. AQUILINA:  I think he understands the question.

5         THE COURT:  Let me ask the witness, do you

6    understand the question?

7         THE WITNESS:  Yes.

8         THE COURT:  I will allow the witness to answer the

9    question.  Although, let me ask, may I have the reporter read

10   the question again?

11                    (Record read back.)

12        THE COURT:  I will allow the witness to answer that

13   question, if he understands the question.

14        THE WITNESS:  I don't remember, Miss.

15   BY MS. DERBY:

16   Q    Well, do you remember having a phone conversation with me

17   where you said, I am just afraid the government is going to do

18   something to me for testifying.

19   A    I assert the Fifth, ma'am.

20   Q    All right.

21        MS. DERBY:  Your Honor, other than -- I stand by my

22   legal arguments.  I think we don't have sufficient foundation

23   to take the Fifth on these questions.

24        I have no further questions.

25        THE COURT:  Okay.

1          Let me ask the government -- before I do that, let me

2    ask any defense counsel, do you have any further questions for

3    this witness?

4               MR. DIAMOND:  No, Your Honor.

5               MR. NOVAK:  No, thank you.

6               MR. KHOJAYAN:  No, Your Honor.

7               THE COURT:  Does the government have any questions

8    for the witness?

9               MS. NG:  Yes, Your Honor.

10                     CROSS-EXAMINATION

11   BY MS. NG:

12   Q    Good morning, Mr. Macias.

13   A    Good morning, Miss.

14   Q    You were previously convicted of two felonies; is that

15   correct?

16   A    I assert the Fifth, ma'am.

17   Q    And you have been in jail for your current case since

18   about April of 2022?

19   A    Yes.

20   Q    So you have been in custody for about four years now on

21   your current case?

22   A    Yes.

23   Q    So, based on having spent some time in custody, you

24   understand that there is, like, a hierarchy on how things work

25   with the inmates, right?

```
 1   A    Yes.

 2   Q    And so you're now a inmate at the Metropolitan Detention

 3   Center in Los Angeles?

 4   A    Yes.

 5   Q    And you have testified that Mr. Lerma was your cellmate

 6   for about a whole month in March of 2024?

 7   A    Yes.

 8   Q    Did you guys talk during that time?

 9   A    Yes.

10   Q    What sorts of things did you guys talk about?

11            MR. AQUILINA:  Objection, Your Honor.  Vague.

12            THE COURT:  I will sustain the objection.

13   BY MS. NG:

14   Q    Did he ever talk to you about his case?

15            THE COURT:  You need a foundation, what case are you

16   talking about?

17   BY MS. NG:

18   Q    Do you know why he's in federal custody?

19            MR. AQUILINA:  Objection.  Speculation, lack of

20   foundation.

21            THE COURT:  I will allow him to answer that question

22   if he knows why he and Mr. Lerma were in custody at the time

23   this witness said he had discussions with him.

24            THE WITNESS:  No.

25   BY MS. NG:
```

1    Q    You are not aware of what Mr. Lerma has been accused of?

2         THE COURT:  That's not the question.

3    BY MS. NG:

4    Q    Sorry.

5         In the time you were cellmates with Mr. Lerma, are you

6    aware -- did you learn why he's in custody?

7         THE COURT:  Let me ask the government a question,

8    why are you asking these questions of this witness?

9         MS. NG:  I'm asking to establish that Mr. Lerma has

10   power over other inmates at MDC.

11        THE COURT:  What relevance does that have as to this

12   particular inquiry?

13        MS. NG:  It has to go with his credibility and his

14   reasons for signing the declaration.

15        THE COURT:  So you want to open the door that I

16   previously indicated that as to the defense counsel's

17   questioning, you want to open the door for her?  Okay.

18        If that's what you want to do, that is fine, open the

19   door for her.

20        MS. NG:  I will move on.

21        THE COURT:  Okay.

22   BY MS. NG:

23   Q    After you were cellmates with Mr. Lerma, you had asked to

24   be moved into protective custody, right?

25   A    Yes.

**UNITED STATES DISTRICT COURT**

```
 1   Q     That is because you flushed down $17,00 worth of heroin
 2   down the toilet?
 3   A     I assert the Fifth.
 4   Q     You are aware that that heroin belonged to the Mexican
 5   Mafia?
 6   A     I assert the Fifth, ma'am.
 7   Q     Are you aware?
 8             THE COURT:  Counsel, he has asserted the Fifth.
 9        Why are you going on about this?
10             MS. NG:  Your Honor, the government would
11   respectfully move to admit Mr. Macias's certified conviction
12   records.
13        Mr. Macias did plead the Fifth as to his prior felonies,
14   felony convictions, for which he was sentenced to over a year
15   for both of them.  One of them was for carjacking.
16             THE COURT:  Let me stop you.  That is as to his past
17   criminal record.
18             MS. NG:  Yes, Your Honor, for impeachment purposes.
19             THE COURT:  What is the relevance of that?
20             MS. NG:  It goes to Mr. Macias's credibility.
21             THE COURT:  I will allow you to ask the witness
22   whether or not he has any prior felony convictions within the
23   last ten years.
24   MS. NG:
25   Q    Mr. Macias, do you have any prior felony convictions
```

**UNITED STATES DISTRICT COURT**

```
 1   within the last ten years?

 2   A    I assert the Fifth, ma'am.

 3   Q    Mr. Macias, are you aware that the defendants in this

 4   case, Mike Lerma, Carlos Gonzalez, Jose Valencia Gonzalez and

 5   Juan Sanchez are looking at a lot of time in federal prison?

 6   A    I don't know, ma'am.

 7   Q    Are you aware they're looking at a lot of time in federal

 8   prison for killing another inmate, who owed a drug debt to the

 9   Mexican Mafia?

10         THE COURT:  Let me ask, counsel, again, do you want

11   to open the door for the defense on these points?

12         I don't understand why you constantly doing this.

13         The more you do it, at some point in time, I'm going to

14   say you have opened the door.

15         In fact, if you ask one more question, I will say you

16   have opened the door.

17         MS. NG:  Your Honor, we will submit.

18         THE COURT:  All right.  Anything else from any other

19   counsel?

20         MS. DERBY:  I have one question, Your Honor.

21         THE COURT:  All right.

22                    REDIRECT EXAMINATION

23   BY MS. DERBY:

24   Q    After you saw me and signed that declaration, isn't it

25   true you received information that the prosecutor on your case
```

UNITED STATES DISTRICT COURT

1    knew about the declaration you signed; is that correct?

2    A     I assert the Fifth, ma'am.

3              MS. DERBY:  Your Honor, how can that possibly be a

4    Fifth Amendment claim?

5              THE COURT:  Let me hear from the defense counsel for

6    the witness, what is your response to that question?

7              MR. AQUILINA:  Your Honor, first of all, I should

8    probably have objected for lack of foundation, and if I

9    understand where counsel may be going, it goes to a

10   attorney-client privilege as well.

11             THE COURT:  I agree with the latter.

12             MS. DERBY:  I'm not asking about what he said to his

13   attorney or what anyone said to anyone, it's just was he

14   informed that the prosecutor --

15             THE COURT:  I presume he would have been informed by

16   his attorney, I don't think that the prosecutor would have had

17   a discussion with this witness outside the presence of his

18   counsel or through his counsel.

19             MS. DERBY:  Just being informed is not a violation

20   of attorney-client privilege.

21             THE COURT:  But the questions and discussions

22   between counsel and client are attorney-client privilege.

23   BY MS. DERBY:

24   Q     Were you ever shown any writings about your declaration

25   you signed in my presence?

1       Were you ever shown any emails about your declaration

2    from the prosecutor in your case?

3              MR. AQUILINA:  Your Honor, I'm going to object.

4    Vague as to time and foundation as far as shown by whom.

5              MS. DERBY:  I can --

6              MS. NG:  Outside the scope.

7              THE COURT:  Well, I will allow the question to be

8    rephrased, if she can do it.

9    BY MS. DERBY:

10   Q    After you signed your declaration in my presence on

11   September 19th, 2025, were you shown any emails from the

12   prosecutor on your case referencing your declaration?

13             MR. AQUILINA:  I believe the question was, was he

14   shown any emails concerning his declaration from the

15   prosecution.

16             THE COURT:  I don't know if it was limited.  Why

17   don't you rephrase your question.

18             MR. AQUILINA:  Sorry.

19   BY MS. DERBY:

20   Q    After your signing the declaration in my presence on

21   September 17th, of 2025, were you shown any emails or writings

22   from the prosecutor in your case regarding knowledge or

23   regarding your declaration you signed?

24   A    No.

25   Q    Were you informed about emails from the prosecutor in your

1    case?

2              MR. AQUILINA:  Again, lack of foundation, potential

3    attorney-client privilege.

4              THE COURT:  I will sustain the objection.

5    BY MS. DERBY:

6    Q    All right.  I have no further questions.

7              THE COURT:  Any other questions from anybody?

8              MS. NG:  No, Your Honor.

9              THE COURT:  Let me ask the witness a couple of

10   questions.  You indicated that at some point in time you did

11   have a discussion with Ms. Derby, the attorney who is

12   questioning you just now?

13             THE WITNESS:  Yes.

14             THE COURT:  Had you ever met her before?

15             THE WITNESS:  Met her before?

16             THE COURT:  In other words, prior to this time that

17   you had a discussion with her?

18             THE WITNESS:  No.

19             THE COURT:  Prior to meeting with her, did you have

20   any idea as to what she wanted to talk to you about?

21             THE WITNESS:  No.

22             THE COURT:  So you have, prior to meeting her, you

23   had no idea as to why she wanted to talk to you at that point,

24   did you?

25             THE WITNESS:  No.  I didn't even know who she was.

```
 1              THE COURT:  Those are all of my questions.
 2         Does anybody else have any questions?
 3              MS. NG:  No, Your Honor.
 4              THE COURT:  Thank you very much.  The witness is
 5    excused.  Any other witnesses?
 6              MR. KAHAN:  No further witnesses from the
 7    government.
 8              THE COURT:  Anything else from the defendant?
 9              MS. DERBY:  Yes, Your Honor, I did want to inform
10    the Court that I filed a declaration, it's Document
11    Number 1912, regarding my attempt to locate and interview G and
12    Bad Boy, the other people, that are referenced in Mr. Navarro's
13    declaration, and I also asked the government to provide the
14    IHQs for those potential witnesses.
15         I have not received them, however, I did just think of
16    asking about that over the weekend, but it is just a call to
17    Ms. Shin who can then obtain those records for the government.
18              THE COURT:  What is the position of the government
19    in regards to that?
20              MR. KAHAN:  Shortly after Mr. Derby's request on
21    Saturday, I sent an email to Ms. Shin.  She responded on Sunday
22    saying it's been assigned to someone, I have yet to receive
23    them.
24              MS. DERBY:  So what I would ask, Your Honor, is when
25    you look at the declaration, you can see that those witnesses
```

```
 1   are also potential and likely corroborating witnesses to

 2   Navarro, however, their counsel want their cases finished

 3   before they allow me to speak with them.

 4        So what I would like is for this Court to issue writs, a

 5   short continuance, to issue writs for those two witnesses,

 6   and --

 7             THE COURT:  Let me ask, when are those potential

 8   witnesses, when are their cases going to be over?

 9             MS. DERBY:  Well, one is set for trial in March.

10             THE COURT:  Well, let me just ask if it goes to

11   trial in March, if that defendant loses, the defendant has the

12   right to appeal.

13        Am I supposed to wait for the appeal period as well?

14             MS. DERBY:  Well, maybe then, the federal defender

15   will allow me to speak to them, and I could say by speaking

16   with the federal defender, and reading between the lines, these

17   witnesses are going to be helpful, but they will not allow me

18   to obtain any sort of declaration until their cases are over.

19             THE COURT:  Well, let me hear from the government,

20   what is the government's position on this?

21             MS. NG:  Your Honor, based on our reading of the

22   declaration, it says the federal defender refused to allow me

23   to contact their client or have their client provide a

24   declaration.

25        It sounds like Ms. Derby is reading in her own hopes
```

1    after their cases are completed, that their counsel would then

2    at that point, be willing to advise the clients to testify.

3    This is all speculation.

4         That is as to both individuals that I see in here, it

5    doesn't seem like they suggested -- it doesn't seem like they

6    would agree to it.

7              MS. DERBY:  No.  I was told by one of the counsel to

8    continue the case, my case, because Judge Wu will grant a

9    continuance, and continue it after their case is done.

10             THE COURT:  They are wrong on that.

11        It's a motion for new trial.

12        Again, at best, I suppose one could say that those

13   witnesses might provide some corroborative information

14   consistent with the declarations that were proffered as to

15   Mr. Navarro.

16        But, it doesn't seem to me they are going to have that

17   much to offer, independent of what he has already testified

18   about.

19             MS. DERBY:  Well, again, Your Honor, then I would

20   also note that I filed Document Number 1903, which was an

21   ex-parte application for discovery for the government to

22   provide information relating to Jose Martinez's recent

23   hospitalization, and that the Court has never answered, I

24   assume maybe a pending motion, but that is still outlying.

25             THE COURT:  What is the government's response?

**UNITED STATES DISTRICT COURT**

1          MR. KAHAN:  None of it is discoverable under the

2     rules of, at least, our obligations for discovery in terms of

3     any reports related to Mr. Martinez's recent supervised release

4     violation or that underlying reports, which the Court has

5     recently heard from.

6          In that case from another AUSA, the records are

7     speculative, it's a fishing expedition, it's well after the

8     fact of his testimony and of the incident itself that any

9     probative value of which I can think of none, but any probative

10    value would be thoroughly outweighed by undue prejudice at this

11    stage.

12          THE COURT:  All right.  Let me ask, what docket

13    number is that?

14          THE COURTROOM DEPUTY:  No. 1903.

15          MR. KAHAN:  While I was in the middle of talking

16    about IHF records, they were provided to me.  I will provide

17    them with attorney eyes only.

18          THE COURT:  I will allow both sides to file one

19    supplemental brief.  Each side is to give, like, closing

20    arguments in regards to this motion, based on the evidence that

21    I have heard.

22          I will not -- I only want one.  I'm not going to allow

23    replies or responses, just only one from both sides.  In other

24    words, collectively the defense will submit one, and the

25    government will submit one.

45

```
 1          I will give each side a week to give me that.
 2          So, you file that by the 2nd of March, and I will make a
 3   ruling.  Once I have seen that stuff, I will not have you guys
 4   making any further arguments.
 5          MR. AQUILINA:  May I be excused?
 6          THE COURT:  Yes, you are excused.
 7          MR. NOVAK:  I have two requests, if I may?
 8          THE COURT:  Sure.
 9          MR. NOVAK:  One is a couple of more days after
10   March 1st, just because of obligations and other cases.
11          THE COURT:  March 1st is actually a Sunday, so, I
12   will certainly give you March 1st.
13          MR. NOVAK:  Is that what you said March 1st?
14          THE COURT:  I said March 2nd.
15          MR. NOVAK:  I'm asking for a couple of more days.
16          THE COURT:  In other words, you want it later
17   than -- in other words, if I were to say March 5th?
18          MR. NOVAK:  It would be a fantastic birthday.  It's
19   my dad's birthday, so it is perfect.
20          THE COURT:  That is how you honor your dad, by
21   submitting legal papers?  A good son.
22          MR. NOVAK:  No, he's my first mentor as a lawyer.
23          THE COURT:  I think at this point you owe him a tie.
24          MR. NOVAK:  What?
25          THE COURT:  Or maybe one of those paper mache things
```

```
 1    of your hand or something like that with, I love you, dad.
 2              MR. NOVAK:  I think he wants a chile verde burrito
 3    and a beer.
 4              THE COURT:  Just pay attention to him and listen to
 5    him, that's all he wants.
 6         We will have everybody file on the 5th.
 7              MR. NOVAK:  Thank you, Your Honor.
 8         I don't know a day has ever gone by in this courtroom
 9    when Your Honor didn't use me as a punching bag.  It's fine.
10              THE COURT:  I don't know what it is, you are just
11    there.
12         What can I say, you take it so well, let's put it that
13    way.
14              MR. NOVAK:  Thank you, because the government is
15    going to produce these additional IHQs, the Court will --
16              THE COURT:  When you say the government, you are
17    going to produce them in the next couple of days, right?
18              MR. KAHAN:  A day, if anything.
19              THE COURT:  He will produce them.
20              MR. NOVAK:  In addition to the closing argument,
21    post-hearing brief, there may be additional exhibits is what
22    I'm saying.
23              THE COURT:  You can include that within your
24    submissions.
25              MR. NOVAK:  Very well.  I do have a question about
```

1    whether we need to do this by way of exhibit or by way of

2    judicial notice.

3         And that is the fact that Mr. Martinez has been or was

4    in federal custody beginning on approximately December 24th.

5         I know that since that time, he's appeared before this

6    Court, the Court has addressed his supervised release

7    violation.

8         I had prepared Exhibit F, which the government has,

9    which is just his order of detention, because that was before

10   he was brought before Your Honor.

11        THE COURT:  I presume you can produce that as a

12   matter of public record.

13        The violation is -- what happened is a matter of public

14   record.

15        MR. NOVAK:  As long as the government is not going

16   to object to the Court taking judicial notice that he was in

17   federal custody.

18        THE COURT:  I don't see how they could.

19        MR. NOVAK:  I have an exhibit, which I could maybe

20   move into evidence, which might be simpler.

21        THE COURT:  Whichever way, that is fine.

22        MR. NOVAK:  We will do it one way or another on

23   March 5th.

24        THE COURT:  Okay, that is fine.

25        MR. DIAMOND:  We also have a sentencing scheduled

**UNITED STATES DISTRICT COURT**

```
 1   for March 11th, with I think briefs due, is it March 11th or

 2   March 9th with sentencing briefs due on Monday the 2nd?

 3                THE COURT:  Yes.

 4                MR. DIAMOND:  Could we push that back so we know how

 5   this is resolved, before we submit sentencing memoranda?

 6                THE COURT:  So you want to continue the sentencing

 7   date?

 8                MR. DIAMOND:  Yes.

 9                MR. KAHAN:  We would object.  Also, victim notice

10   that would be required as well, and have the opportunity to

11   object as well, but we would object further continuance.

12                THE COURT:  All right.  The answer is no.  It will

13   remain on the 9th.  You are going to give me the briefs anyway

14   on the 2nd, the other hearing is on the 5th.

15                MS. DERBY:  Your Honor, I'm not sure about getting

16   the transcript of today's hearing.  Can you order -- do we have

17   to file and do the paperwork?

18                THE COURT:  You have to make arrangements with my

19   reporter.  Anything else from anybody?

20                MR. KAHAN:  No, Your Honor.

21                THE COURT:  Anything else from anybody?

22                MR. NOVAK:  Sorry, Your Honor, I was being educated.

23   Are you okay with March 2nd for the sentencing?

24                MR. MILLER:  Yes.

25                THE COURT:  March 9th is the sentencing.
```

**UNITED STATES DISTRICT COURT**

1              MR. NOVAK:  I was talking about the deadline of the

2    brief.  I was speaking with Mr. Miller through the microphone.

3              MR. KHOJAYAN:  I have a question.  I heard, in your

4    Court's tentative, I think there was a footnote you were asking

5    to find out when the defense knew about Mr. Navarro, and the

6    defense provided the Court a statement as to when that was.

7    Does the Court still have any questions about that?

8              THE COURT:  Well, I have received what you have

9    filed.

10         I will take a look at it, although, I have taken a look

11   at it already, but at this point in time, I don't have any

12   questions.

13             MR. KHOJAYAN:  Okay.  Thank you.

14             THE COURT:  All right.  Thank you, everybody.  Have

15   a very nice day.

16             (The proceedings concluded at 11:13 a.m.)

17                           *  *  *

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6            I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date: 3rd day of March, 2026.

17

18

19                            /s/ TERRI A. HOURIGAN

20                    _____
                      TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
21                            Federal Court Reporter

22

23

24

25

**UNITED STATES DISTRICT COURT**

# Exhibit L

**F I L E D**
CLERK, U.S. DISTRICT COURT

9/7/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DTA _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

April 2022 Grand Jury

| UNITED STATES OF AMERICA, | No. 8:22-cr-00132-CJC |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [21 U.S.C. §§ 841(a)(1), |
| JOHNNY GERMAIN MACIAS, | (b)(1)(A)(viii), (b)(1)(C): Possession with Intent to Distribute Methamphetamine and Fentanyl; 18 U.S.C. |
| Defendant. | § 924(c)(1)(A)(i): Possession of Firearm in Furtherance of a Drug Trafficking Crime; 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition; 21 U.S.C. § 853, 18 U.S.C. § 924(d)(1), and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about April 19, 2022, in Orange County, within the Central District of California, defendant JOHNNY GERMAIN MACIAS knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 25.23 kilograms, of methamphetamine, a Schedule II controlled substance.

COUNT TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about April 19, 2022, in Orange County, within the Central District of California, defendant JOHNNY GERMAIN MACIAS knowingly and intentionally possessed with intent to distribute N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide ("Fentanyl"), a Schedule II narcotic drug controlled substance.

COUNT THREE

[18 U.S.C. § 924(c)(1)(A)(i)]

On or about April 19, 2022, in Orange County, within the Central District of California, defendant JOHNNY GERMAIN MACIAS knowingly possessed a firearm, namely, a 9mm pistol, bearing no serial number (commonly referred to as a "ghost gun") in furtherance of a drug trafficking crime, namely, possession with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), as charged in Count One of this Indictment, and possession with intent to distribute N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide ("Fentanyl"), in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), as charged in Count Two of this Indictment.

COUNT FOUR

[18 U.S.C. § 922(g)(1)]

On or about April 19, 2022, in Orange County, within the Central District of California, defendant JOHNNY GERMAIN MACIAS knowingly possessed ammunition, namely, approximately thirty-one rounds of Precision Made Cartridges 9mm caliber ammunition, each in and affecting interstate and foreign commerce.

Defendant MACIAS possessed such ammunition knowing that he had previously been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

(1)  Carjacking, in violation of California Penal Code Section 215, in the Superior Court of the State of California, County of Orange, case number 16CF1486, on or about August 17, 2016; and

(2)  Assault with Force Likely to Produce Great Bodily Injury, in violation of California Penal Code Section 245(a)(4), in the Superior Court of the State of California, County of Orange, case number 19CF1464, on or about May 20, 2020.

FORFEITURE ALLEGATION ONE

[21 U.S.C. § 853; 18 U.S.C. § 924; 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 21, United States Code, Section 853, Title 18, United States Code, Section 924, and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in either of Counts One or Two of this Indictment.

2.   The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)   All right, title and interest in any and all property, real or personal, constituting or derived from, any proceeds which the defendant obtained, directly or indirectly, from any such offense;

(b)   All right, title and interest in any and all property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any such offense;

(c)   All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

(d)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.   Pursuant to Title 21, United States Code, Section 853(p), and as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be

located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in either of Counts Three or Four of this Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

     (a)   All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

     (b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the convicted defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

///

///

///

7

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

                                        A TRUE BILL

                                        __/s/_____
                                        Foreperson

STEPHANIE S. CHRISTENSEN
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office

BRADLEY E. MARRETT
Assistant United States Attorney
Deputy Chief, Santa Ana Branch
Office

8